**UNITED STATES of America, Plaintiff,**

v.

**Joel PASCAL, Defendant.**

**No. 79 CR 98–2.**

United States District Court,
N. D. Illinois, E. D.

June 27, 1979.

Thomas McQueen, Candy Fabri, Asst. U. S. Attys., Chicago, Ill., for plaintiff.

Samuel K. Skinner, Prentice Marshall, Jr., William F. Conlon, Sidley & Austin, Chicago, Ill., for defendant.

ROSZKOWSKI, District Judge.

This cause comes before the court on Defendant Joel Pascal's motions to dismiss the indictment and to suppress evidence. A hearing on these motions was held on May 29, 1979, June 1, 1979, and June 18, 1979. Oral arguments on the motions were heard on June 22, 1979. Defendant Joel Pascal was indicted for violation of two counts of Title 21, United States Code, Section 841(a)(1), one count of Title 21, United States Code, Section 846, and one count of Title 21, United States Code, Section 843(a).

### FACTS

In 1978, the Drug Enforcement Administration (DEA) was conducting an investigation into the use of controlled substances by members of the Chicago Board Options Exchange (CBOE) and drug activities at the CBOE. In early 1978, the DEA identified Sheldon Stern as a participant in drug traffic related to the CBOE. Agent Tucci of

the DEA testified that he had several telephone conversations with Stern in early 1978. In early July of 1978, Stern indicated to Agent Tucci that Stern's "source" would be going to Florida and would secure a quantity of cocaine while there. On July 11, 1978, Stern called Agent Tucci and said that his source was leaving to go to Florida. On July 13, 1978, Agent Tucci telephoned Stern who stated that he was to meet with his source at 4:00 P.M. on July 13. Agent Tucci passed this information on to Agents Kowalski and Follett and, late in the afternoon of July 13, 1978, Agents Kowalski and Follett observed Stern enter an apartment building at 111 East Chestnut Street in Chicago. Later that afternoon, Agents Follett and Kowalski saw Stern in the company of Pascal. That information was then apparently transmitted by Agents Follett and Kowalski to Agent Tucci who in turn called Agent Thomas Thompson at the airport. Agent Thompson testified that Agent Tucci telephoned him and instructed him to "intercept" Pascal.

Agent Tucci testified that after this information was conveyed to him he called Agent Thompson and instructed Thompson to arrest Pascal upon his return from Florida. Agent Thompson then monitored Pascal's flight to Florida and his return trip from Florida.

Agent Thompson and other DEA agents assigned to the airport met Pascal's flight from Florida at about 11:00 on July 17th. They observed Pascal as he left the boarding area and he was carrying two bags. Pascal proceeded to a phone booth and they overheard a brief conversation in which Pascal said "Shelly, I will be there in 25 minutes, sharp." After placing that call, Pascal, still carrying the two bags, walked quickly down the corridors and down the escalator to the cab stand.

At the cab stand, Pascal was stopped by Agent Thompson and two other DEA agents. Agent Thompson and the other DEA agents told Pascal that they were looking for a man who was smuggling jewelry and, although Pascal did not look like the man nor was he dressed like the man they were seeking, those agents wanted to talk to him. At that point, Pascal was not free to leave and was in the custody of the agents. From the taxi stand, Agent Thompson led the way into the lower level adjacent to the public baggage claim area of Delta Airlines. At that point, Pascal indicated that he would be willing to show DEA agents what he had in his bags, but he would not allow them to search the bags since he had, among other things, accounting papers which he did not want disturbed. As Pascal began to open the first of the bags, one of the DEA agents began to reach into the bag and at that point Pascal said that he would not allow the DEA agents to look further, nor would he reveal to them any of the other documents that he had in the luggage. Inside the terminal and prior to Pascal's opening of his bags, Agent Thompson testified that he informed Pascal that he wished to look into his luggage and that, if Pascal did not consent to the search, he, Agent Thompson, would get a search warrant.

In the public area adjacent to the Delta baggage claim area, Pascal told Agent Thompson that he wanted to talk to an attorney. At that point, Agent Thompson did not allow him to call an attorney but instead told Pascal to close up his bags and follow him. Again, Pascal was surrounded by DEA agents and led to the non-public baggage area of Delta Airlines on the lower level of O'Hare International Airport.

In the non-public area of Delta Airlines, Mr. Thompson took Pascal's bags and placed them on a conveyor belt with other luggage. Two United States Customs Agency dogs sniffed at all the bags on the conveyor belt. Mr. Pascal testified that the dogs had no reaction to his luggage or any other bags on the conveyor. Agent Thompson testified that one dog alerted, indicating the presence of narcotics in Pascal's bags. He also testified that the second dog confirmed the other's narcotics alert on Pascal's bags.

The court finds Agent Thompson's testimony on this subject highly suspect in that on July 14, 1978, just three days prior to the

incident involving Pascal's luggage, Agent Thompson, as defendant's uncontroverted Exhibit 30 demonstrates, engaged in what appears to be a totally unconstitutional search and seizure of bags under similar circumstances in the Delta baggage claim area.

As a result of Agent Thompson's participation in the July 14, 1978 baggage search, this court must give his testimony little, if any, weight.

Moreover, one of the customs agent's dogs involved in the alleged search now before the court was also involved in the prior allegedly unlawful search and seizure on July 14, 1978. The reliability of the dog in the instant search is equally questionable based upon the circumstances surrounding the July 14, 1978 search by that same dog. Properly excluding any suggestion of reliability which might arise out of the July 14, 1978 search, one dog involved in the instant search found cocaine on only one occasion in the preceding six months prior to July 17, 1978, and the other found none.

After the dogs sniffed Pascal's luggage, Pascal was then taken into an office in the non-public area of the Delta baggage claim section where he, Agent Thompson, and another unidentified DEA agent spent approximately 20 to 45 minutes. During that period of time, Thompson told Pascal that he, Thompson, was Pascal's "best friend" at that moment and that he realized that Pascal was just a "mule" (someone who is not in the business of selling or distributing cocaine, but simply carries cocaine for others). Thompson told Pascal that he would be interested in having Pascal cooperate and apparently spoke in a friendly manner with Pascal for that period of time. Thompson, Pascal, and the other DEA agent then left the Delta Airlines area and proceeded by car to the DEA office in the international terminal at O'Hare International Airport. At the international terminal, Thompson continued to talk to Pascal and, at some point at the international terminal, Pascal again asked Thompson if he could secure the services of an attorney at that time. Thompson informed Pascal that

he would not be permitted a lawyer since the DEA agents worked undercover and were afraid, if any attorney were called in, that their undercover identities would be disclosed. Thompson, in the course of this conversation, told Pascal that if he cooperated, the Drug Enforcement Administration would make his cooperation known to the U.S. Attorneys and recommend that Pascal not be indicted. Thompson said that with Pascal's cooperation plus a recommendation from DEA that he not be prosecuted it would be extremely unlikely the government would prosecute Pascal. Pascal then signed a consent to search form when Thompson told him that to do so would be an indication of his willingness to cooperate. Pascal then, as part of his cooperation with the government, placed a telephone call to Stern and related to Stern a story that had been concocted by agents of the Drug Enforcement Administration. Pascal then left O'Hare Airport to meet with the DEA agents on the following day. Agent Thompson impounded Pascal's bags which were only returned to Pascal on July 18 at approximately 3:00 P.M. after a federal search warrant had been secured and after Pascal's initial briefing at the Drug Enforcement Administration on the 18th floor of the Dirksen Federal Building.

On July 18, 1978, Pascal met with Agent Thompson, Agent Edmund Irvin, Agent Steven Bushendorf, and Intelligence Analyst Franz Hirzy, who is also a DEA agent. This meeting took place at the Drug Enforcement Administration offices at the 18th floor of the Dirksen Federal Building. At that time, Pascal again indicated that he wanted to cooperate, and it was generally agreed that Pascal would work with Mr. Bushendorf's group. Thompson testified that although he did not work personally with Pascal he would have wanted to.

On July 20th, Pascal met with Agent Edmund Irvin and discussed the topic of cocaine and the Chicago Board Options Exchange. Pascal at that time indicated that he had not worked with the CBOE for approximately six months but did give to Irvin eight names of individuals he believed

were familiar with or dealing in cocaine. On July 25th, Pascal called the Drug Enforcement Administration and on July 26th he met at the Federal Inn, a restaurant, with Agents Irvin and Thompson. On August 5, 1978, Mr. Thompson indicated that he wanted the name of Pascal's source in Florida and Pascal gave him that individual's name. At that point, Agent Thompson told Pascal that he was "80% of the way there" in fulfilling his promise to cooperate.

In early August of 1978, Pascal met again with representatives of the Drug Enforcement Administration and at the DEA office. While he was cooperating, Pascal met with representatives of DEA at Berghoffs Restaurant, the Federal Inn, the Marquette Inn, and several other restaurants in the Loop area and held three or four meetings with Drug Enforcement Administration representatives at the Drug Enforcement Administration office.

On July 28 Pascal had asked representatives of the Drug Enforcement Administration if they would meet with his attorney, Van Stillman, Esq., who was then from Fort Lauderdale, Florida. The representatives of the Drug Enforcement Administration refused to meet Stillman but did allow Stillman to call them and discuss Pascal's cooperation. It was agreed during discussion that Pascal would continue to cooperate, and the Drug Enforcement Administration would live up to its part of the bargain. During this conversation, the Drug Enforcement Administration agreed that Pascal would not have to be present when any arrests were made, would not have to testify, and would not have to give the names of social friends who were not business dealers of cocaine.

On August 5th, Pascal met with Agents Irvin and Thompson and was told by Irvin that his first job would be the infiltration of the CBOE. Irvin told Pascal that he would not be required to participate in any plan about which he felt uncomfortable and that he would later be assigned to an agent who would work with him.

On August 17 or 18, Irvin contacted Pascal by telephone and requested that Pascal try to initiate something, such as arranging a "buy" for the following week. Pascal told Irvin that he did not think he would be able to get anything going so soon since he still was becoming familiar with the CBOE and would need more information before he could make any such arrangements. Irvin insisted and said that he still wanted Pascal to get something going and to call him on August 21 or 22. When Pascal attempted to contact Irvin on August 21 or 22, 1978, Pascal was told that Irvin was out of town.

There is no dispute that between July 18, 1978 and February 7, 1979, the defendant had frequent and substantial contact with members of the Drug Enforcement Administration. Pascal testified that as a result of his discussions with Agent Thompson and with other members of the Drug Enforcement Administration on July 18, 1978, it was his understanding that if he cooperated, the Drug Enforcement Administration would make his cooperation known to the United States Attorneys and based on his cooperation and the recommendation of the Drug Enforcement Administration that it was very unlikely he would be prosecuted.

Pascal had frequent meetings and telephone calls with members of the Drug Enforcement Administration through the month of August. In September, Pascal set up a buy from a woman named Lisa Duncan, who had some relationship with the CBOE, in which agents of the Drug Enforcement Administration met Lisa Duncan and were shown samples of the cocaine which she was then selling. The Drug Enforcement Administration, for reasons unknown to Pascal, determined not to proceed with that purchase. When Pascal asked DEA if he could arrange for a third party to make a purchase from Lisa Duncan, DEA approved. Pascal arranged that purchase so as to be of further assistance to DEA.

Pascal's cooperation continued during the month of October and in early November Pascal traveled to Florida. Prior to his departure, Mr. Pascal advised the Drug Enforcement Administration of his itinerary and made arrangements to contact Drug

Enforcement Administration agents in Florida. While in Florida during the early part of November 1978, Pascal had contact with Agent Grobe of the Chicago DEA office, who had also traveled to Florida, and Pascal continued to provide information to Grobe during his stay. When Pascal returned to Chicago, he provided further information to agents of the Drug Enforcement Administration.

Without any prior notice to Pascal, on February 7, 1979, he was indicted by a Federal Grand Jury. At no time prior to the indictment did members of the Drug Enforcement Administration advise the United States Attorney's office of Pascal's cooperation but, to the contrary, advised the United States Attorney's office that Pascal had thought about cooperating but had then quit. That communication was not only incorrect but also was of such a nature so as to cause the United States Attorney's office to think that Pascal had been offered an opportunity to cooperate and had chosen not to do so, when quite the contrary was the fact.

The Grand Jury which indicted Mr. Pascal was not aware that he had in fact cooperated, had in fact provided information to the Drug Enforcement Administration, had in fact set up buys for Drug Enforcement agents, had provided information to the Drug Enforcement Administration not only in the Chicago area but in geographic areas far distant from the Northern District of Illinois, and had to his prejudice served the Drug Enforcement Administration agency under his agreement with the government.

The facts of this case call to mind Mr. Justice Brandeis' dissent in *Olmstead v. United States*, 277 U.S. 438, 468, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928), wherein he wrote:

> In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.

DEA's conduct throughout this investigation falls woefully short of proper law enforcement procedure. The government concedes that DEA promised Pascal that any cooperation by him would be made known to the United States Attorney's office, and the government has stipulated that this promise was not kept. The government further concedes that dismissal of the instant indictment is appropriate. The sole issue presented for this court's determination is whether the indictment ought to be dismissed with prejudice.

The government submits that the appropriate remedy is dismissal of the indictment without prejudice. While admitting that Pascal is entitled to the benefit of his bargain (i. e., his cooperation was to be made known to the executive branch during the decision making process), the government argues that Pascal's cooperation was minimal and does not warrant an absolute guarantee from prosecution for his unlawful activity. The government characterizes Pascal's cooperation as not significant or productive, citing the fact that Pascal set the parameters of his own cooperation by refusing to be present for arrests, refusing to testify in court, and refusing to give the names of social friends who were not business dealers of cocaine.

In response, Pascal states that the agreement entered into between himself and DEA was two-pronged: first, Pascal agreed to cooperate and his cooperation would be made known to the United States Attorney's office. It is undisputed that DEA failed to honor this portion of the agreement. Second, and more importantly, Pascal contends that DEA agreed, based upon the extent of Pascal's cooperation, to recommend to the United States Attorney's office that he (Pascal) not be prosecuted. Obviously, Pascal's chances of not being indicted were directly proportional to the degree of his cooperation. Pascal contends that he was advised by DEA agent Thompson that based upon his cooperation plus a recommendation from DEA that he not be prosecuted, it would be extremely unlikely that the government would prosecute Pascal. However, the uncontroverted evidence

reveals that the DEA never recommended that Pascal not be prosecuted. In fact, the United States Attorney's office was misled by the Drug Enforcement Administration and acted without the benefit of this information both before the indictment in February, 1979 and until the present hearing on the Motion to Suppress.

Pascal argues that his cooperation with DEA was extensive and substantial. In support of his contention, Pascal cites the following: providing Agent Irvin names of eight persons on the CBOE whom Pascal believed were involved in cocaine transactions. During the hearing held in this matter, Agent Tucci admitted on the stand that several of the names provided him by Pascal were targets of DEA investigations. Pascal further provided DEA Agent Grobe the name of a significant Miami, Florida cocaine dealer. He personally set up a "buy" in the Chicago area which the DEA refused to consummate. He made numerous telephone and personal contacts with various DEA agents throughout the relevant time period. Finally, he provided agent Thompson the name of his Florida source to which Thompson responded by reassuring Pascal that he was "80% of the way there." Agent Thompson's remark can only be interpreted as meaning that DEA was satisfied with Pascal's cooperation and was prepared to contact the prosecutor's office in accordance with the terms of their agreement upon Pascal providing DEA with the remaining 20% of the necessary information.

Why was Pascal unable to provide DEA with the additional information which would have assured DEA compliance with the agreement? The government attributes the restrictive nature and scope of Pascal's involvement in any investigation as the main ingredient in Pascal's failure to reap the benefit of his bargain. The court notes that, at the very beginning of their negotiations with Pascal, DEA specifically agreed to the very terms of which they now complain. It was not until several months after Pascal had been cooperating with DEA that DEA decided to unilaterally modify the terms of the agreement by insisting that Pascal set up five or six "big busts" in

which he would be present and participate in any arrests, and presumably testify. When Pascal refused to accept these modifications, DEA obviously felt no longer obligated under the prior terms of their agreement. Thus, Pascal was precluded from successfully completing his end of the bargain, because DEA refused to deal with him under the previously agreed to conditions. The evidence indicates that Pascal was unable to fully perform under the agreement because DEA prevented his performance. Consequently, DEA never contacted the United States Attorney's office regarding Pascal's cooperation nor did they make any recommendation despite the fact that Pascal had successfully completed at least 80% of his bargain.

There is, however, one aspect of Pascal's performance under the agreement which this court finds troublesome. It relates to Pascal's private purchase of cocaine from Lisa Duncan which he subsequently used personally, sold to third persons, and finally sought reimbursement for the remainder which he turned over to DEA. Upon learning of Pascal's activity concerning this particular transaction, DEA would have been justified in terminating their agreement thereby exposing Pascal to prosecution without the benefit of the bargain. DEA, however, did not terminate its dealings with Pascal but rather simply reprimanded him for his misconduct and continued to work with Pascal in gathering confidential drug information. The government cannot now be heard to argue that Pascal's unlawful conduct is justification for DEA's non-compliance with the agreement.

Clearly this court has the power to dismiss the indictment with prejudice under its supervisory powers. *United States v. Rodman*, 519 F.2d 1058 (1st Cir.1975). In *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1973), Justice Frankfurter took note of these inherent powers:

> Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence.

318 U.S. at 340, 63 S.Ct. at 613.

The government cited a number of cases which generally held that dismissal of an indictment with prejudice was not a proper remedy under particular circumstances of governmental misconduct. All of these cases are distinguishable because of one critical difference with the facts in the instant case. Here, the prejudice suffered by Pascal cannot possibly be cured. In the cases cited by the government, some sort of remedy short of dismissal was reached which protected the rights of the defendant.

Case law also dictates that when the "totality of circumstances" surrounding the government misconduct is such as to offend basic tenets of fair play and justice, dismissal of the indictment with prejudice is proper. *See generally, Rochin v. People of California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *Coplon v. United States*, 191 F.2d 749 (D.C.Cir.1951); *United States v. Heath*, 260 F.2d 623 (9th Cir.1958); and *United States v. Russo*, Crim. No. 9373 (C.D.Cal.1973), as discussed in *United States v. McCord*, 509 F.2d 334, 349 n.50 (D.C.Cir. 1974).

The government suggests that a *de novo* determination of Pascal's cooperation in this case should be made by the executive branch. Based on this determination, a decision to reindict will be made. They suggest that the appointment of a special prosecutor from another district would provide the necessary unbiased view needed in such a situation. It is possible that a special prosecutor who is unbiased could be appointed. Nevertheless, the crux of the problem would remain unchanged regardless of who the special prosecutor is. The key issue in this case is whether Pascal was allowed to perform his part of the agreement he made with DEA. Given the conduct of the DEA agents, it would be impossible to determine that issue no matter who examines the facts of this case and makes a decision on whether to reindict.

Another troubling aspect of appointing a special prosecutor revolves around the sources of information this individual would have. While undoubtedly the special prosecutor would have the record of this case before him, that record would certainly be tainted by the conduct of certain agents of the DEA, whose credibility is, to say the least, highly suspect. We find that such a situation would put Pascal at an unfair disadvantage and would certainly not place him in the position he would have been in absent the DEA actions. It becomes clear that the appointment of a special prosecutor will in no way remedy the problems in this case.

The decision in this case was extremely difficult to reach because a dismissal with prejudice will have the effect of barring prosecution of Pascal. Mr. Pascal's conduct in this case was, to say the least, reprehensible, and this court, by its decision, in no way minimizes that conduct. In fact, the defendant's actions are all the more aggravated by the fact that he is obviously a well educated person who has had the benefit of many social and economic advantages in his life. Given the proper motivations he could make a positive contribution to society, rather than wasting his time and talents in unsavory pursuits.

One point which the court wishes to make clear is that throughout the entire circumstances of this case, there has not been even the slightest hint of any misconduct or impropriety on the part of the United States Attorney's office. They were confronted with an unfortunate situation and handled a difficult matter in an exceedingly competent and professional way.

It should also be pointed out that the misconduct of certain DEA agents in this case should in no way reflect on the agency as a whole. Numerous DEA agents have previously come before this court and have impressed this court as honest and professional public servants. Theirs is a thankless and often dangerous job, and this court has nothing but respect for the DEA as a whole and for the vast majority of its agents.

This court recognizes that dismissal of an indictment with prejudice is not a step to be taken lightly. Nor is this court unaware that its supervisory power is limited and should be exercised rarely and with extreme caution. As pointed out by the

government in its response to the defendant's brief, "the basis of this restraint is the public interest in enforcement of our criminal laws, an interest which should not be forfeited on less than compelling evidence of prejudice and inability to receive a fair trial." In this court's view of the evidence in the present case, only dismissal with prejudice will cure the damage caused by the conduct of certain agents of the Drug Enforcement Administration. Broad considerations of public policy and the fair administration of justice require that this court exercise its supervisory powers in order to protect the integrity of the whole judicial process. Under the facts in this case, this court is left with no alternative except to dismiss the indictment with prejudice.

Accordingly, defendant Pascal's motion to dismiss the indictment against him with prejudice is granted.[1]

1. In light of our decision today, the court need not consider the issues raised in Pascal's remaining pretrial motions.