(No. 59840.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RONNIE L. STARKS, Appellant.

*Opinion filed April 19, 1985.—Modified on denial
of rehearing May 31, 1985.*

442

Robert J. Hauser, of Waukegan, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Mark L. Rotert and James E. Fitzgerald, Assistant Attorneys General,

of Chicago, of counsel), for the People.

CHIEF JUSTICE CLARK delivered the opinion of the court:

The defendant, Ronnie L. Starks, was indicted for the armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2) of the Libertyville Federal Savings and Loan Association branch in Gurnee, Illinois. A jury in Lake County convicted him and he was sentenced to 11 years' imprisonment. The defendant filed a motion for a new trial which was denied. On defendant's appeal, the appellate court affirmed the circuit court. (122 Ill. App. 3d 228.) The defendant then petitioned this court for leave to appeal, and we granted the defendant's petition.

The facts of this case are that Jalena Gutman, a teller at Libertyville Federal Savings and Loan Association branch in Gurnee, testified that while she was working as a teller she was robbed at gunpoint at about 6:30 p.m. on Friday, January 15, 1982. Gutman, as well as Donna Vasey, another teller on duty that evening, identified the defendant as the bank robber. They identified the defendant on three separate occasions: (1) from photos shown to them the evening of the robbery; (2) in an in-person lineup on March 10, 1982; and (3) in court.

The defendant did not testify in his own defense. However, Starks' uncle, aunt, mother and a friend testified that Starks was in East Bernstadt, Kentucky, from December 25, 1981, until his arrest by the Kentucky police on January 20, 1982. The defendant's sister testified that the day of the robbery she phoned her mother in Kentucky at approximately 3:30 p.m., which was three hours before the robbery. She testified that during the conversation, she heard the defendant's voice in the background. The defendant also called one of the State's witnesses, Gurnee police sergeant Sheldon, who testified that Gutman and Vasey described the robber as being 6

feet tall, 185 pounds, with grey or green eyes. The defendant's actual physical description is 5 feet 8 inches tall, 156 pounds, with blue eyes.

Based upon the aforementioned testimony, the jury found the defendant guilty of armed robbery, and the trial court entered judgment on the verdict.

The defendant's attorney filed a motion for a new trial. After this motion was filed, the defendant dismissed his attorney and retained new counsel. The defendant's newly retained counsel filed a supplement to the motion for a new trial. The supplemented motion identified seven alibi witnesses who were not called by defendant's trial counsel. The affidavits of these witnesses were attached to the motion. The motion also alleged that the defendant had submitted himself to a polygraph examination based upon a representation by the Lake County State's Attorney's office that the charge would be dismissed if the defendant passed the test. The motion further alleged that the defendant passed the test, but that the State's Attorney's office reneged on its part of the agreement.

Another supplement to the motion for a new trial was filed, alleging that the defendant's appointed trial counsel failed to provide the defendant with effective assistance of counsel. The circuit court denied the defendant's motion for a new trial.

The defendant raises three issues in this appeal, namely: (1) whether the State is bound by a pretrial agreement in which the State agreed to dismiss its case against the defendant if the defendant took and passed a polygraph test; (2) whether the defendant was denied effective assistance of counsel at his trial; and (3) whether defendant was denied his right to a fair trial by the introduction of evidence regarding an alleged previous assault and battery.

First, we will address the issue regarding the pretrial

agreement. Starks contends that a Lake County assistant State's Attorney agreed to dismiss the charge against him if he would submit to and pass a polygraph examination conducted by Libertyville police lieutenant Danny McCormick. Pursuant to the agreement, Starks was transported from the Lake County jail on March 30, 1982, to the Libertyville police department, where the polygraph examination was conducted. Starks further contends that McCormick specifically questioned him as to his involvement in the January 15, 1982, armed robbery and that McCormick found him to be truthful in his denial of any knowledge of or involvement in the robbery.

There was no mention of the polygraph examination in the pretrial motions. The first reference in the record to the polygraph examination was on June 29, 1982, after the jury was sworn in, when the State made a motion *in limine* to bar any reference during trial to the polygraph examination. The motion *in limine* stated that "the defendant, his attorney and all witnesses be precluded from committing [*sic*] upon, testifying about or questioning about the defendant taking a polygraph exam or the results thereof." The trial judge granted the State's motion, and told the defendant:

> "What has occurred here is, they have asked that everybody be precluded from talking about a lie detector test, okay. Our Supreme Court has said a lie detector test is not evidence in a case, and in any case, and even if the parties agreed its going to be evidence in the case, it can't be evidence in the case, and therefore, you are precluded from ever mentioning that as evidence; and I would not just tell you, and I will caution [your attorney], and neither you nor any of the witnesses can testify about the fact there has been any polygraph or lie detector evidence. * * *"

The first reference in the record to the agreement re-

garding the polygraph examination was when the circuit court heard oral arguments on the supplemented motion for a new trial. However, the trial judge refused to consider the pretrial agreement regarding the polygraph examination and refused to allow counsel to make any record pertaining to the agreement. The trial judge's refusal was based upon this court's decision in *People v. Baynes* (1981), 88 Ill. 2d 225.

Starks moved to supplement the record on appeal with affidavits which tended to establish that there was a pretrial agreement. One of the affidavits, which was unsigned, was from the defendant's trial counsel. That affidavit stated that there was a pretrial agreement. The other affidavit was from the defendant's present counsel. That affidavit stated that the defendant's trial counsel had told him that the unsigned affidavit was accurate, but the reason it was unsigned was because the Lake County State's Attorney's office (the trial counsel's present employer) would not allow the defendant's trial counsel to sign the affidavit. The appellate court denied the defendant's motion to supplement the record with these affidavits. Although the appellate court stated that the trial judge had misapplied this court's holding in *Baynes,* the appellate court did affirm the circuit court's judgment. The appellate court stated, with regard to the pretrial agreement:

> "During the post-trial hearing concerning this issue, the court may have misapprehended the thrust of counsel's argument and, therefore, did not fully consider whether the defendant was entitled to relief. The defendant's point was not that the favorable results of the polygraph examination should have been allowed in evidence—clearly that would not have been permissible; rather, that the defendant gave up his right against self-incrimination in reliance upon the promise of the State's Attorney to dismiss the charge if he passed the examination.
>
> However, the record here is not complete enough to

allow the conclusion that there was, in fact, an agreement or if there was what its terms were. The defendant has failed to show us evidence which would support his argument on this issue. He, therefore, cannot sustain his position and no reversal is therefore mandated." 122 Ill. App. 3d 228, 239.

It is also important to note that the State does not deny the existence of the agreement. In addition, at the post-trial hearing the defendant testified that the prosecution told him that if he took the polygraph test and passed, then the armed-robbery charge would be dismissed. During this post-trial hearing, the trial judge asked the defendant: "And on what basis did you take that polygraph examination? What was your understanding if you passed it?" In response Starks testified: "The understanding that I had got from him, that the State told him if I passed the polygraph test they would drop the charge."

In Starks' brief before this court, he states that the issue is whether the State is bound by a pretrial agreement in which the State agreed to dismiss its case against him if he passed a polygraph test. Such a statement presumes that an agreement existed. As this matter stands before us, proof of such an agreement consists of: (1) the trial counsel's unsigned affidavit stating that there was a pretrial agreement; (2) a signed affidavit by the defendant's present counsel which stated that the trial counsel told him that the unsigned affidavit was accurate; and (3) Starks' testimony under oath that there was a pretrial agreement, whereby if he passed the polygraph examination the State agreed to dismiss its charge.

We do not place much credence in an unsigned affidavit or in a hearsay affidavit. We believe that neither of these affidavits justifies a reversal of the defendant's conviction and a remand for an evidentiary hearing. However, we do believe that Starks' testimony under oath, as to the existence and terms of the alleged pretrial agreement, is suffic-

ient to send this cause back for an evidentiary hearing to determine if such an agreement existed.

Any doubt as to the existence of the agreement could have been alleviated had Starks' present counsel subpoenaed the trial counsel and/or the assistant State's Attorney involved in the alleged agreement. In addition, Lieutenant McCormick should have been subpoenaed in order to determine the results of the polygraph examination.

Assuming, *arguendo*, that such an agreement existed, the issue becomes whether that agreement is enforceable.

We agree with the appellate court's interpretation of our holding in *People v. Baynes* (1981), 88 Ill. 2d 225. In *Baynes*, this court held that polygraph evidence is not admissible, even if the parties stipulated to the results, to prove the guilt or innocence of the defendant.

The case at bar, however, does not involve the admissibility of polygraph evidence to prove guilt or innocence. In this case the issue is whether an *agreement* between the State and a defendant, which required the State to dismiss its case against the defendant if the defendant took and passed a polygraph examination, is enforceable.

The bargaining relationship between the State, by its agent, the prosecutor, and a defendant charged with a crime is now universally recognized. The Supreme Court has stated:

> "The disposition of criminal charges by agreement between the prosecutor and accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities." *Santobello v. New York* (1971), 404 U.S. 257, 260, 30 L. Ed. 2d 427, 432, 92 S. Ct. 495, 498.

The State's Attorney is an elected representative of the

People; he has been given the responsibility of evaluating evidence and determining what offense, *if any,* can and should properly be charged. Prosecutors have traditionally been afforded a broad range of discretion within which to perform their public duties. (*People v. McCollouch* (1974), 57 Ill. 2d 440, 444.) The prosecution must honor the terms of agreements it makes with defendants. To dispute the validity of this precept would surely result in the total nullification of the bargaining system between the prosecution and the defense. Therefore, this court believes that if the prosecution did make an agreement with the defendant, it must abide by its agreement in this case.

While this is a case of first impression in Illinois, we note that two of our sister State courts have dealt with the issue which is before us.

In *People v. Reagan* (1975), 395 Mich. 306, 235 N.W.2d 581, the defendant was charged with assault with intent to do great bodily harm and with torturing a child. The prosecutor's office agreed to dismiss the charges if the defendant passed a polygraph examination. The defendant passed the polygraph examination and, pursuant to the agreement, the prosecutor sought an order of *nolle prosequi,* which was approved by the trial court. However, the prosecutor's office then reinstated the charges, having obtained information that the polygraph examination may have been unreliable. The defendant was tried and convicted on both charges. The appellate court affirmed the circuit court. The Michigan Supreme Court reversed the conviction and discharged the defendant. The problems with the polygraph examination which we set forth in *People v. Baynes* were also recognized by the *Reagan* court. While conscious of these problems, the *Reagan* court stated:

> "While by no means disapproving the use of the polygraph as is the current practice, in retrospect we feel constrained to observe that it would have been advisable, at the very least, that the prosecution acquaint itself with

the limitations of the polygraph before entering into an agreement to dismiss the case on the basis of polygraph results and then proceeding on to *nolle prosequi*. The nature of the agreement should have been stated by the prosecutor on the record before the trial court. \*\*\*

\*\*\* In our view, a pledge of public faith in this instance gave force to an unwise agreement which became binding upon trial court approval of *nolle prosequi*." 395 Mich. 306, 318, 235 N.W.2d 581, 587.

The court concluded: "[L]aw enforcement processes are committed to civilized courses of action. When mistakes of significant proportion are made, it is better that the consequences be suffered than that civilized standards be sacrificed." 395 Mich. 306, 319, 235 N.W.2d 581, 587.

The Florida Appellate Court has decided two cases dealing with the issue of whether the defendant is entitled to fulfillment of a promise such as the agreement in the case at bar; they are *State v. Davis* (Fla. App. 1966), 188 So. 2d 24, and *Butler v. State* (Fla. App. 1969), 228 So. 2d 421. In *State v. Davis,* the defendant was indicted for first-degree murder and pleaded not guilty. Shortly before trial, Davis and the prosecution entered into a bargain whereby Davis agreed to take a polygraph examination administered by an appointed examiner. If the polygraph showed the defendant was telling the truth, the case against him would be dismissed. Conversely, if the test showed he was not telling the truth, he would enter a plea of guilty to the lesser charge of manslaughter. The test was given by the appointed examiner, who stated that the defendant was telling the truth. The examiner who administered the test sought subsequent verification by another polygraph examiner. This second examiner questioned whether the examination showed that Davis was telling the truth. Therefore, the prosecution refused to dismiss the indictment. The defendant then moved to have his case dismissed on the basis of the bargain. In finding the bargain enforceable,

the Florida Appellate Court stated:

"[I]t can be seen that where a plea of guilty is entered in reliance upon a promise to dismiss other charges, the promise may be enforced and raised as a bar to prosecution. The difference between that situation and the one before us is the added act regarding the polygraph examination. Defendant had agreed to plead guilty to manslaughter if the test was not in his favor, but the state had agreed to dismiss the case if the results indicated defendant was telling the truth. This was a pledge of public faith—a promise made by state officials—and one that should not be lightly disregarded." *State v. Davis* (Fla. App. 1966), 188 So. 2d 24, 27.

The record in the case at bar is unclear as to the exact terms of the agreement. Therefore, we do not know what Starks agreed to do had he not passed the polygraph examination. Assuming, *arguendo,* that Starks did not agree to do anything if he did not pass the polygraph examination, we do not agree with the State's contention that the bargained offer to Starks was a "gift-type" bargain which lacked the consideration to make it binding. Such a contention is without merit because there would be consideration given by both parties in the alleged agreement in the case at bar. By submitting himself to the polygraph examination, the defendant surrendered his fifth amendment privilege against self-incrimination. When a prosecutor enters into an agreement of this kind he has doubts about a defendant's guilt. If the defendant fails the polygraph examination, such doubts may be removed and a faltering investigation can be revitalized. A prosecutor is less likely to agree to concessions after a defendant's failure of a polygraph examination. He also knows that if the defendant fails the polygraph examination and then takes the stand at trial the defendant may wilt under the pressure of intense cross-examination. Additionally, there is no way of assuring that the test results will not come to the judge's attention; therefore, a defendant may be compelled, as a

practical matter, to elect a jury trial. The test results may also strengthen a judgment of conviction resulting in imposition of a longer sentence or delay in parole.

In *Butler v. State*, the defendant was charged with rape. After indictment, Butler and the prosecutor reached an agreement that the charges would be dismissed if the polygraph results indicated that Butler was telling the truth. However, if the results were unfavorable to Butler the test would be admissible in his rape trial. The polygraph examiner concluded that the defendant was telling the truth when he denied participation in the rape. An order of *nolle prosequi* was entered. Nevertheless, the State initiated prosecution. The defendant was indicted and convicted. His motion to quash on the basis of the agreement was denied.

In holding that the State was bound to abide by the agreement, the *Butler* court questioned the "wisdom" of entering into such agreements. The court concluded that the State has the *right* to "choose its procedures and weapons of prosecution"; however, the State also has the *duty* to abide by an agreement it makes with a defendant. *Butler v. State* (Fla. App. 1969), 228 So. 2d 421, 425.

We believe that in the case at bar if the State made an agreement with the defendant, it is bound to abide by that agreement.

Whatever the situation might be in an ideal world, the fact is that agreements between the prosecution and the defense are an important component of this country's criminal justice system. (See *Bordenkircher v. Hayes* (1977), 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663.) If a defendant cannot place his faith in the State's promise, this important component is destroyed.

In the case at bar, the agreement allegedly rested upon the State's promise to dismiss the charge against Starks. If there was an agreement as alleged, and if Starks fulfilled his part of it, then the State must fulfill its part.

Accordingly, this cause is remanded to the circuit court for an evidentiary hearing to determine if there was such an agreement and, if so, to implement it by appropriate orders. If there was no agreement, or if the defendant did not fulfill its terms, then the original judgment and sentence shall be reinstated without prejudice to defendant's rights to appeal.

*Judgments reversed; cause remanded, with directions.*

JUSTICE WARD, dissenting:

I join in the dissent of Justice Miller, who correctly observes that the defendant was not disadvantaged in any way by taking the polygraphic examination.

Of course, there are circumstances in which the prosecution should be and is bound to fulfill promises to an accused. Plea bargaining, which was discussed in *Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495, is a familiar example of the binding promise. There are circumstances, too, where it would be a disservice to the public interest and justice to enforce the terms of a statement made to an accused. The required balancing of considerations was described in *United States v. Pascal* (N.D. Ill. 1979), 496 F. Supp. 313, which involved a promise made by agents that any cooperation by the defendant would be made known to the United States Attorney. The court observed: "Case law also dictates that when the 'totality of circumstances' surrounding the government misconduct is such as to offend basic tenets of fair play and justice, dismissal of the indictment with prejudice is proper. [Citations.]" The court went on to say:

> "This court recognizes that dismissal of an indictment with prejudice is not a step to be taken lightly. Nor is this court unaware that its supervisory power is limited and should be exercised rarely and with extreme caution. As pointed out by the government in its response to the

defendant's brief, 'the basis of this restraint is the public interest in enforcement of our criminal laws, an interest which should not be forfeited on less than compelling evidence of prejudice and inability to receive a fair trial.' " 496 F. Supp. 313, 319-20.

The majority paints with too broad a brush when it says that the prosecution must honor the terms of all agreements made with defendants.

The majority, following the mistaken analysis of the defendant, talks in terms of legal consideration as if contract law were involved. (Even in *People v. Reagan* (1975), 235 N.W. 2d 581, 585, 395 Mich. 306, 314, on which the majority principally relies, the court pointed out that a contract law analysis is incorrect, saying "[t]he standards of commerce do not govern, and should not govern, the administration of criminal justice.") The majority then goes on to say under this contract analysis that the defendant surrendered his fifth amendment privilege against self-incrimination. This, of course, is illusory. Results of a polygraphic examination are inadmissible even though the parties might wish to stipulate to the results being received in evidence. The defendant here gave up nothing; he did not risk self-incrimination in submitting to a test, the results of which could not be introduced in evidence. In no way did the defendant impair his "not guilty" position, and in no way did his taking the test improve the prosecution's opportunities for conviction. The taking of the polygraph examination was of no more legal effect than if he had agreed to a spiritualistic seance, or to having tea leaves read or to having a coin flipped on the question of whether he robbed the bank. The dissenting opinion in *People v. Reagan* acutely noted that under the resembling circumstances there:

"The defendant having given up nothing has lost nothing. The worst that could have happened to him was to remain in the same legal posture.

***

Defendant risked nothing in this one-sided 'agreement'—and indeed had nothing to lose by taking the polygraph test. It is the people of Michigan who instead are cast in the role of 'losers.' " *People v. Reagan* (1975), 235 N.W.2d 581, 590, 395 Mich. 306, 325.

MORAN and MILLER, JJ., join in this dissent.

JUSTICE MILLER, also dissenting:

I dissent. The majority seems to make no distinction between an agreement made but not kept by the State which led, or might have led, to the conviction of a defendant, and an agreement made but not kept by the State which resulted in no disadvantage to the defendant.

Had the State here, as in *Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495, reneged either accidentally or purposely on an agreement which led to the conviction of the defendant through a plea of guilty, I would agree that the agreement should be enforced. Had the State here, as in *Butler v. State* (Fla. App. 1969), 228 So. 2d 421, and *State v. Davis* (Fla. App. 1966), 188 So. 2d 24, reneged on an agreement which might have led to the conviction of the defendant, I might also enforce the agreement.

Here, though, the defendant gave up nothing in exchange for the State's promise. The results of a polygraph test may not be used at trial in a criminal case in Illinois (*People v. Baynes* (1981), 88 Ill. 2d 225), in the sentencing phases of a capital case (*People v. Szabo* (1983), 94 Ill. 2d 327), or in the hearing on a post-trial motion (*People v. Yarbrough* (1982), 93 Ill. 2d 421). Thus, I disagree with the majority's suggestion that in submitting to the test the defendant took the risk that a negative result could adversely affect his trial or sentence.

While I certainly do not condone the failure of the

State to keep an agreement made with a defendant no matter how ill-advised that agreement might be, I would not set aside the verdict of the jury and enforce the agreement under the circumstances here. Had the defendant made an incriminating statement during the taking of the test, or had the defendant been disadvantaged by the test in any way, I would then apply sanctions appropriate to the circumstances.

A defendant cannot compel, as a matter of Federal constitutional law, specific performance of an executory plea agreement; a guilty plea made with the knowledge that a prior plea agreement has been withdrawn is not invalid. (*Mabry v. Johnson* (1984), 467 U.S. ___, 81 L. Ed. 2d 437, 104 S. Ct. 2543.) I see no reason for recognizing a greater entitlement here. Under the circumstances in this case, I do not believe that the defendant should be allowed to now compel the performance of a promise which did him no harm and for which he gave nothing in return. Accordingly, I dissent.

WARD and MORAN, JJ., join in this dissent.