2024 IL 130431

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 130431)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
JUSSIE SMOLLETT, Appellant.

*Opinion filed November 21, 2024.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Justices Neville, Overstreet, Holder White, and O'Brien concurred in the judgment and opinion.

Chief Justice Theis and Justice Cunningham took no part in the decision.

**OPINION**

¶ 1     "The public justifiably expects the State, above all others, to keep its bond." *Bowers v. State*, 500 N.E.2d 203, 204 (Ind. 1986).

¶ 2    Today we resolve a question about the State's responsibility to honor the agreements it makes with defendants. Specifically, we address whether a dismissal of a case by *nolle prosequi* allows the State to bring a second prosecution when the dismissal was entered as part of an agreement with the defendant and the defendant has performed his part of the bargain. We hold that a second prosecution under these circumstances is a due process violation, and we therefore reverse defendant's conviction.

¶ 3                                    BACKGROUND

¶ 4    A complete statement of facts may be found in the appellate court's opinion. See 2023 IL App (1st) 220322, ¶¶ 3-13. We set forth here only those facts necessary for an understanding of the sole issue we decide.

¶ 5    On March 8, 2019, a grand jury returned a 16-count indictment charging defendant, Jussie Smollett, with felony disorderly conduct. See 720 ILCS 5/26-1(a)(4) (West 2018). The charges alleged that defendant falsely reported to Chicago police officers that he had been the victim of a hate crime.

¶ 6    Eighteen days later, on March 26, 2019, an assistant state's attorney explained in open court before Judge Steven Watkins that the State was moving to nol-pros the charges. The assistant state's attorney explained the decision to the court as follows:

> "Judge, on today's date, the State does have a motion in this case. After reviewing the facts and circumstances of the case, including Mr. Smollett's volunteer service in the community and agreement to forfeit his bond to the City of Chicago, the State's motion in regards to the indictment is to [nol-pros]. We believe this outcome is a just disposition and appropriate resolution to this case.
>
> I do have an order directing the Clerk of the Circuit Court to release Bond No. D 1375606, payable to the City of Chicago, to be sent directly to the City of Chicago, Department of Law. And there's an address and the person there who takes care of that on behalf of the City."[1]

---

[1]The amount of the bond was $10,000.

The trial court granted the State's motion to nol-pros and to release defendant's bond to the City of Chicago.

¶ 7    On April 5, 2019, a retired appellate court justice filed a *pro se* motion to appoint a special prosecutor in the matter of *People of the State of Illinois v. Jussie Smollett*. The motion raised questions about the resolution of the charges and the manner in which the Cook County State's Attorney, Kim Foxx, had recused herself.

¶ 8    After briefing and argument, Judge Michael Toomin entered an order granting the appointment of a special prosecutor. In the order, Judge Toomin reviewed the facts of the case and wrote that the disposition of the case by way of a *nolle prosequi* had "shocked officialdom as well as the community." Judge Toomin noted that both then-Mayor Rahm Emanuel and then-President Donald Trump had issued statements condemning the resolution of the case. Judge Toomin specifically found that negotiations on the disposition had dated back to February 26, 2019, when First Assistant State's Attorney Joseph Magats wrote that the Cook County State's Attorney's Office (CCSAO) could offer diversion and restitution but would indict if something could not be worked out. On February 28, 2019, the chief of the criminal division told detectives that they could no longer investigate the crime and that she felt that the case would be settled with defendant paying $10,000 in restitution and doing community service.

¶ 9    Judge Toomin then addressed at length the circumstances surrounding Foxx's recusal. Judge Toomin found that, once Foxx recused herself, appointment of a special prosecutor was required. Instead, Foxx appointed her first assistant, Joseph Magats, as the acting state's attorney for this matter. Judge Toomin found that Foxx had appointed Magats to an entity that did not exist because there is no legally cognizable office of "Acting State's Attorney." Judge Toomin noted that in *People v. Ward*, 326 Ill. App. 3d 897 (2002), the court had held that, if a case is not prosecuted by an attorney properly acting as an assistant state's attorney, the prosecution is void and the cause should be remanded for prosecution by a proper prosecutor. Judge Toomin also cited cases where proceedings had been voided because of prosecutions by unlicensed attorneys. Judge Toomin concluded that there was no duly elected state's attorney of Cook County when defendant was arrested, charged, indicted, or arraigned and that there was no state's attorney in the courtroom when the *nolle prosequi* was entered. Accordingly, Judge Toomin

determined that appointment of a special prosecutor was mandated to conduct an independent investigation of the actions of any person or office involved in this case and to determine if reasonable grounds existed to further prosecute defendant.

¶ 10    Judge Toomin later appointed Dan Webb as special prosecutor. Following the Office of the Special Prosecutor's (OSP) investigation, a special grand jury indicted defendant on six counts of felony disorderly conduct. See 720 ILCS 5/26-1(a)(4) (West 2018). In an information release, which is part of the record, the OSP explained that reasonable grounds existed to further prosecute defendant because he had planned and participated in a staged hate crime attack and thereafter made numerous false statements to Chicago police officers.

¶ 11    In the information release, the OSP also stated that it had determined that further prosecution of defendant was in the interests of justice for several reasons. First, the OSP relied on the extensive nature of the false police reports and the resources expended by the Chicago Police Department to investigate them. Second, the OSP contended that the CCSAO's disposition of this case was not similar to how it had disposed of similar cases. The CCSAO had stated in a press release that the case was being resolved under the same criteria that would be available for any defendant with similar circumstances. The OSP sought documentary evidence that would back up this claim, and the CCSAO was unable to provide it. Third, the OSP disagreed with how the CCSAO "resolved the Smollett case." The OSP stated that it had obtained evidence showing that the CCSAO believed that the case was strong at the time it obtained the 16-count indictment against defendant. However, just three weeks later the CCSAO decided to resolve the charges under the following circumstances:

> "1) complete dismissal of the 16-count felony indictment; 2) only punishment for Mr. Smollett was to perform 15 hours of community service; 3) requiring Mr. Smollett to forfeit his $10,000 bond as restitution to the City of Chicago (a figure amounting to less than 10% of the $130,106.15 in police overtime pay that the City alleges it paid solely due to Mr. Smollett's false statements to police); 4) not requiring that Mr. Smollett admit any guilt of his wrongdoing (in fact, following the court proceedings on March 26, Mr. Smollett publicly stated that he was completely innocent); and 5) not requiring that Smollett participate in the CCSAO Deferred Prosecution Program (Branch 9),

which he was eligible to participate in, and which would require a one-year period of court oversight of Mr. Smollett."

Fourth, the CCSAO decision-makers had been unable to identify any new evidence they learned of between indictment and dismissal that changed their view of the strength of the case against defendant.

¶ 12    Defendant moved to dismiss the new indictment on double jeopardy grounds. He also moved to dismiss on the basis that the appointment of the special prosecutor was invalid. The trial court denied both motions. Defendant later hired new counsel, who moved to dismiss the indictment on the basis of the agreement he had reached with the CCSAO. Defendant argued that he had entered into a nonprosecution agreement with the CCSAO and that the agreement was executed and enforced. He further argued that the OSP was bound by the agreement because the OSP and the CCSAO are both agents of the State. Defendant performed his part of the agreement when he forfeited his monetary bond and satisfied prosecutors as to his performance of community service, and the State performed its end of the agreement when it dismissed the case against him. Defendant cited *People v. Starks*, 106 Ill. 2d 441 (1985), for the proposition that agreements between the prosecution and the defense will be enforced and, if the defendant performs his end of the bargain, then the State must fulfill its part. Defendant further contended that public policy supports enforcing agreements between the prosecution and the defense. Defendant asserted that he had been duped by the State because it reindicted him after he had forfeited a substantial bond to the City of Chicago in exchange for getting the charges dismissed. The trial court heard oral argument on the motion. During oral argument, counsel for defendant argued that what happened here was more egregious than in other Illinois cases where the prosecution reneged on a deal. Here, the deal had already been enforced, and the OSP was attempting to resurrect something that had already been decided. The trial court denied the motion. The court stated that Judge Toomin had found that "there really was no State's Attorney running the show at that time because of the confusion caused by the recusal announcement that was publicly made." Accordingly, the court stated that it was not going to challenge Judge Toomin's order or his reasoning and that it could not find a way to grant pretrial relief.

¶ 13    Following a jury trial, defendant was convicted of five counts of felony disorderly conduct. The trial court sentenced him to 30 months' probation, with the first 150 days to be served in the Cook County Jail. The court also ordered him to pay a $25,000 fine and $120,106 in restitution to the City of Chicago.

¶ 14    Defendant appealed, raising 13 issues. The appellate court described his appeal as challenging "virtually every aspect of the second prosecution that resulted in his convictions and sentence." 2023 IL App (1st) 220322, ¶ 1. The appellate court rejected all of his arguments and affirmed his convictions and sentence. *Id.* ¶ 148. Relevant to his argument that the second prosecution was barred because he had entered into a nonprosecution agreement with the CCSAO, the appellate court majority held that the second prosecution was not barred because the first case was disposed of with a *nolle prosequi*. *Id.* ¶¶ 28-30. The majority stated that well-established Illinois law provides that a *nolle prosequi* is not a final disposition and will not bar a second prosecution for the same offense. *Id.* ¶ 29. The majority acknowledged the dissent's argument that the State's right to reindict after a *nolle prosequi* can be bargained away when making a bilateral agreement. *Id.* ¶¶ 29-30. However, the court stated that "no Illinois court has ever applied principles of contract law in interpreting the scope of a *nolle prosequi* disposition in a criminal case." *Id.* ¶ 32. The majority considered several cases where agreements between defendants and prosecutors were enforced but determined that they were all distinguishable. *Id.* ¶¶ 33-38. The court concluded that, here, the record was "silent regarding any nonprosecution agreement between the CCSAO and Smollett" and that the only disposition requested by the CCSAO was a *nolle prosequi*, "which does not impart finality." *Id.* ¶ 37.

¶ 15    Justice Lyle dissented. Justice Lyle would have found the second prosecution barred by the agreement that defendant reached with prosecutors. *Id.* ¶¶ 151-75 (Lyle, J., dissenting). Justice Lyle agreed with the majority that a second prosecution is not barred when the State enters a unilateral *nolle*. *Id.* ¶ 153. However, Justice Lyle cited *State v. Kallberg*, 160 A.3d 1034, 1042 (Conn. 2017), for the proposition that the State can bargain away that right when making a bilateral agreement with a defendant. 2023 IL App (1st) 220322, ¶ 153. Justice Lyle argued that the report that the OSP filed with the trial court detailing the findings of its investigation showed that the CCSAO had entered into an agreement with defendant. *Id.* ¶ 157. The report also explained that the statement the assistant

state's attorney read in court when the charges were dismissed was drafted in conjunction with defendant's attorney. *Id.* Justice Lyle also pointed out that the assistant state's attorney's use of the words "disposition" and "resolution" when entering the *nolle* showed that the CCSAO intended finality. *Id.* ¶ 173.

¶ 16 Justice Lyle argued that the majority's contention that the *nolle* did not bar further prosecution was "unsupported legally and factually." *Id.* ¶ 158. Justice Lyle cited Illinois case law establishing that contract principles apply in the precharging phase. *Id.* ¶ 159. Justice Lyle discussed *Kallberg* at length. She found persuasive the Connecticut Supreme Court's discussion of *nolle prosequi* orders that are entered as a unilateral act by a prosecutor versus those that are entered as part of a bilateral agreement with a defendant. *Id.* ¶¶ 160-63. In the latter situation, reprosecution is barred after a *nolle* if the defendant has performed his obligation under the agreement. *Id.* ¶ 161 (citing *Kallberg*, 160 A.3d at 1042). Justice Lyle would have applied those principles here. *Id.* ¶ 163. Because defendant gave up something of value in exchange for the resolution of the original case, he could not be reprosecuted. *Id.* Justice Lyle then wrote:

> "While that result may have appeared unjust to some, another trial court judge, unrelated to the proceedings, cannot unilaterally renege on the deal and grant the authority to a special prosecutor to violate a deal that bound the State. See *State v. Platt*, 783 P.2d 1206, 1206 (Ariz. Ct. App. 1989) (stating a deferred prosecution agreement 'may not, however, be rescinded simply because the state, on reflection, wishes it had not entered into the agreement at all'). That does not just violate contract law but would be manifestly unjust and would make every agreement the State enters into with a defendant tenuous, leaving defendants wondering whether public outcry would destroy the carefully crafted negotiation with the State. See *People v. Starks*, 106 Ill. 2d 441, 449 (1985). Public policy considerations and reverence for our justice system disfavor reneging on such agreements and should never be outweighed by a cacophony of criticism as to the terms of the agreement." *Id.*

¶ 17 We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Dec. 7, 2023).

¶ 18                                                ANALYSIS

- 7 -

¶ 19    Defendant makes the following five arguments on appeal: (1) he entered into a nonprosecution agreement with the State that should be enforced, (2) double jeopardy considerations precluded the second prosecution because he had already been punished for these same offenses, (3) the trial court erred in denying his Rule 412 motion to compel the OSP to disclose to the court for in-camera review its notes from interviews with two key witnesses (see Ill. S. Ct. R. 412 (eff. Mar. 1, 2001)), (4) his sentence was excessive and influenced by improper aggravating factors, and (5) the restitution order was in error because of problems of proof and because the City of Chicago and the Chicago Police Department cannot be considered "victims" under the applicable statute. We agree with defendant's first contention and therefore do not address the others.

¶ 20    Defendant's argument largely tracks the reasoning of Justice Lyle's dissent. Defendant argues that he entered into a nonprosecution agreement with the State, that he fully performed his part of the agreement, and that therefore any further prosecution of him was barred. He cites authority from Illinois and other jurisdictions in which agreements between defendants and the prosecution have been enforced in a variety of settings. Defendant contends that public policy considerations support enforcing such agreements. He argues that it is irrelevant that the first case was disposed of by way of a *nolle prosequi* because the *nolle* was entered by the State as part of a bilateral agreement. He cites cases in which courts have applied contract principles to enforce nonprosecution agreements within the context of a *nolle prosequi*. According to defendant, if the parties have bargained for a dismissal of the charges and the defendant has performed his part of the bargain, the manner in which the State disposes of the charges is irrelevant. Defendant further contends that, if there were any structural or procedural flaws in the nonprosecution agreement, Illinois law requires that the agreement be enforced if defendant relied on the agreement and his reliance had constitutional implications. Finally, he argues that, if this court has any doubts as to the terms of the agreement entered into between the parties, it should remand the matter for an evidentiary hearing.

¶ 21    The State counters that the record does not show that the *nolle prosequi* was entered into as part of any agreement. Alternatively, the State argues that, to the extent there was an agreement, it was only for a *nolle prosequi* rather than a dismissal with prejudice. The State cites Illinois case law establishing that a

*nolle prosequi* is not a final disposition and that it does not bar further prosecution. The State acknowledges cases that have enforced agreements between the prosecution and the defense. However, the State contends that those cases all involved the defendant waiving a significant constitutional right. The State argues that a remand for an evidentiary hearing would not be appropriate because defendant failed to develop an evidentiary record establishing a nonprosecution agreement and never requested an evidentiary hearing. Finally, the State briefly argues that defendant may not challenge his reprosecution on the basis of a nonprosecution agreement in the first case, as the circuit court found that those proceedings were void.

¶ 22        A reviewing court considers a trial court's ultimate ruling on a motion to dismiss charges under an abuse-of-discretion standard, but where the issues present purely legal questions, the standard of review is *de novo*. See *People v. Stapinksi*, 2015 IL 118278, ¶ 35. Whether a defendant was denied due process and whether that denial was sufficiently prejudicial to require the dismissal of the charges are questions of law, which are reviewed *de novo*. *Id.* Given that the trial court summarily denied defendant's motion to dismiss without resolving any factual questions or even addressing the merits of defendant's arguments, we believe that *de novo* review is appropriate.

¶ 23        In *Santobello v. New York*, 404 U.S. 257, 258 (1971), the defendant agreed to plead guilty to a lesser-included offense of the crime charged if the prosecution would make no recommendation as to the sentence. After the defendant pleaded guilty to the lesser charge, the prosecution recommended the maximum sentence, and the trial court imposed it. *Id.* at 259-60. The United States Supreme Court vacated and remanded, holding that, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262. Courts have also consistently enforced agreements between defendants and the prosecution in a variety of other contexts. As Professor LaFave has noted, courts have

> "enforced prosecution agreements that the charges would be dropped if the defendant passed a polygraph examination, obtained a psychiatric examination producing specified results, ceased his criminal conduct, or aided a criminal

investigation in some way or even if some additional test, to be conducted after a trial postponement agreed to by the defendant, did not implicate the defendant." 4 Wayne R. LaFave *et al.*, Criminal Procedure § 13.5(b) (4th ed. 2023 Update).

In reaching these results, some courts have employed contract principles, while others have argued that it would be a breach of the public faith to not hold the government to its word. *Id.*; see, *e.g.*, *United States v. Castaneda*, 162 F.3d 832, 835-36 (5th Cir. 1998) (explaining that nonprosecution agreements are interpreted in accordance with contractual principles and, if a defendant meets his end of the bargain, the government is bound to perform its end); *State v. Davis*, 188 So. 2d 24, 27 (Fla. Dist. Ct. App. 1966) (promise to dismiss charges if the defendant passed a polygraph examination was "a pledge of public faith—a promise made by state officials—and one that should not be lightly disregarded").

¶ 24    In *Starks*, 106 Ill. 2d at 444, this court addressed a situation where the prosecution allegedly agreed to dismiss the charge against the defendant if the defendant would submit to and pass a polygraph examination. In his motion for a new trial, the defendant alleged that he passed the polygraph but the State did not dismiss the charge. *Id.* This court found the record insufficient to determine whether there was such an agreement, so it remanded the cause to the circuit court for an evidentiary hearing to resolve that question. *Id.* at 451-53. If the circuit court determined that the parties had made such an agreement, this court directed that it implement the agreement by appropriate orders. *Id.* at 453.

¶ 25    The *Starks* court explained why such an agreement was enforceable:

"The State's Attorney is an elected representative of the People; he has been given the responsibility of evaluating evidence and determining what offense, if any, can and should properly be charged. Prosecutors have traditionally been afforded a broad range of discretion within which to perform their public duties. (*People v. McCollouch* (1974), 57 Ill. 2d 440, 444.) *The prosecution must honor the terms of agreements it makes with defendants*. To dispute the validity of this precept would surely result in the total nullification of the bargaining system between the prosecution and the defense. Therefore, this court believes that if the prosecution did make an agreement with the defendant, it must abide by its agreement in this case." (Emphasis added and omitted.) *Id.* at 448-49.

This court noted that the Michigan Supreme Court and the Florida Appellate Court had enforced similar agreements. *Id.* at 449-51 (discussing *People v. Reagan*, 235 N.W.2d 581 (Mich. 1975), *Butler v. State*, 228 So. 2d 421 (Fla. Dist. Ct. App. 1969), and *Davis*, 188 So. 2d 24). This court rejected the State's argument that, assuming that such an agreement existed, then it was simply a " 'gift-type' bargain" lacking any consideration. *Id.* at 451. This court explained that the consideration was the defendant surrendering his fifth amendment privilege against self-incrimination (U.S. Const., amend. V) by submitting to a polygraph exam. *Starks*, 106 Ill. 2d at 415.

¶ 26    In the plea agreement context, this court has declined to require specific performance of agreements if the defendant has not yet pleaded guilty. This court has held that, in this context, a defendant's due process rights may be protected by pleading not guilty and going to trial. See *Stapinski*, 2015 IL 118278, ¶ 46. Thus, in *People v. Boyt*, 109 Ill. 2d 403, 415 (1985), this court declined to require specific performance of a plea agreement when the prosecution withdrew an offer before the defendant pleaded guilty. This court explained that the State's repudiation of the agreement was without constitutional significance because the defendant did not plead guilty in reliance on the agreement. *Id.* This court distinguished *Starks* on the basis that the defendant in *Starks* had surrendered his privilege against self-incrimination by submitting to the polygraph examination, whereas Boyt had "surrendered nothing." *Id.* at 416; see *People v. Navarroli*, 121 Ill. 2d 516 (1988) (relying on *Boyt* and declining to require specific performance of plea agreement when the defendant had not pleaded guilty in reliance on the agreement).

¶ 27    In *People v. Smith*, 233 Ill. App. 3d 342, 344 (1992), the appellate court addressed a situation where charges against the defendant had been dismissed by the prosecutor in exchange for the defendant providing assistance to undercover police in making purchases of cocaine in Ogle County. When the state filed new indictments against the defendant, the trial court dismissed the indictments, finding that reinstating the charges violated the defendant's due process rights. *Id.* The appellate court rejected the State's request for an evidentiary hearing pursuant to *Starks* to determine if there was an agreement and what its terms were. *Id.* at 346. The court held that remand was unnecessary because, unlike in *Starks*, the agreement was set forth in a court transcript. *Id.*

¶ 28    After holding that the new indictments violated both the defendant's due process rights and the prohibition against double jeopardy and were barred by *res judicata*, the appellate court held that the trial court's judgment could also be affirmed on the ground that the defendant had fulfilled her part of the agreement, which the court could enforce as an executed agreement. *Id.* at 348. The State, relying on *Boyt* and *Navarroli*, argued that the State was not bound to honor the agreement. *Id.* at 349. The appellate court disagreed, holding that *Boyt* and *Navarroli* involved plea agreements, while the case before it involved a cooperation-immunity agreement. *Id.* The court distinguished the two situations as follows:

> "[T]he due process implications are different. In the plea agreement scenario, if the defendant has not yet pled guilty, he may still proceed to trial. (*Mabry v. Johnson* (1984), 467 U.S. 504, 507-08, 81 L. Ed. 2d 437, 442, 104 S. Ct. 2543, 2546.) Here, however, it is the violation of 'the right not to be haled into court at all *** [which] operated to deny [defendant] due process of law.' *Blackledge v. Perry* (1974), 417 U.S. 21, 30-31, 40 L. Ed. 2d 628, 636, 94 S. Ct. 2098, 2104." *Id.* at 350.

The court also found it significant that the case before it involved an agreement that had been approved of by the trial court. *Id.* The trial court had dismissed the indictments on the State's motion. *Id.* The court found that *Starks*, rather than *Boyt* and *Navarroli*, was the appropriate precedent. *Id.* The defendant in *Smith*, just like the defendant in *Starks*, had fully performed her part of the bargain and was entitled to specific performance of the agreement. *Id.* at 350-51. The new charges filed against the defendant violated her due process rights. The court also noted that another appellate court decision, *People v. Schmitt*, 173 Ill. App. 3d 66 (1988), had held that to allow the State to violate its part of a cooperation-immunity agreement would " 'constitute judicial approval of the government violating its agreement, a reprehensible aberration.' " *Smith*, 233 Ill. App. 3d at 350 (quoting *Schmitt*, 173 Ill. App. 3d at 101).

¶ 29    In *Stapinksi*, 2015 IL 118278, this court agreed with the *Smith* court's assessment of how plea agreements are different from other types of agreements entered into between the prosecution and the defendant. In that case, the trial court dismissed charges against the defendant after finding that the indictment violated

his due process rights as well as a cooperation agreement he had entered into with police. *Id.* ¶ 25. The court concluded that the defendant had entered into a valid oral cooperation agreement that, if the defendant cooperated in the arrests of certain individuals, he would not be charged. *Id.* The court also found that the defendant's due process rights were violated because he had fulfilled his part of the bargain and incriminated himself in the process. *Id.* A divided appellate court reversed and remanded. *Id.* ¶ 27. This court reversed the appellate court and affirmed the circuit court. *Id.* ¶ 56.

¶ 30    On appeal to this court, the State acknowledged that, in *Starks*, this court had held that due process requires the State to honor agreements it makes with a defendant when a defendant fully performs his end of the bargain. *Id.* ¶ 43. However, the State contended that the officers did not have the authority to enter into the agreement without the approval of the state's attorney. *Id.* The State contended that (1) the State is not required to specifically perform a police officer's unauthorized nonprosecution agreement and (2) dismissal of the indictment was not an appropriate remedy because the defendant's statements could simply be suppressed. *Id.* ¶¶ 43-44. This court rejected both arguments.

¶ 31    This court explained how cooperation agreements differed from plea agreements: in a plea agreement, the detrimental reliance is the waiver of the right to trial, whereas with a nonprosecution agreement, the defendant's cooperation is sufficient consideration for the government's immunity promise. *Id.* ¶ 46. Moreover, the due process implications in each scenario are different. In the plea agreement scenario, if the defendant has not yet pleaded guilty, he still has the option of going to trial. With a cooperation agreement, the violation of the right not to be haled into court is what denies the defendant due process. *Id.* This court further explained that cooperation agreements are analyzed under contract principles and that the principle for enforcing them is the due process clause of the fourteenth amendment (U.S. Const., amend. XIV). *Stapinksi*, 2015 IL 118278, ¶¶ 47-48. This court stated:

> " 'Generally, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected.' (Internal quotation marks omitted.) [*State v. Wacker*, 688 N.W.2d 357, 362 (Neb. 2004)]. '[W]here the government has entered into an agreement with a prospective defendant and the

defendant has acted to his detriment or prejudice in reliance upon the agreement, as a matter of fair conduct, the government ought to be required to honor such an agreement.' (Internal quotation marks omitted.) *Id.*" *Id.* ¶ 48.

This court noted that the essence of due process is fundamental fairness and cited *People v. McCauley*, 163 Ill. 2d 414 (1994), for the proposition that "due process is implicated 'whenever the State engages in conduct towards its citizens deemed oppressive, arbitrary or unreasonable.' " *Stapinski*, 2015 IL 118278, ¶ 51 (quoting *McCauley*, 163 Ill. 2d at 425). This court held that dismissal of the indictment was appropriate because the defendant's due process rights were violated when the State breached the agreement. *Id.* ¶ 52.

¶ 32        The *Stapinski* court also rejected the State's argument that the agreement was unenforceable because the police did not have the authority to bind the state's attorney. *Id.* ¶¶ 53-55. The court noted that the trial court had found that the defendant fulfilled his obligations under the agreement and that his due process rights were violated when the State later charged him. *Id.* ¶ 55. This court held that, under these circumstances, it did not matter whether the agreement was valid in the sense that it was approved by the state's attorney. *Id.* The court explained that "[a]n unauthorized promise may be enforced on due process grounds if a defendant's reliance on the promise has constitutional consequences." *Id.* As the defendant had suffered a prejudicial violation of his due process rights, dismissal of the indictment was appropriate even if the police did not have the authority to bind the state's attorney. *Id.*

¶ 33        If defendant is correct that the initial charges were dismissed as part of an agreement with the State in which he fully performed his end of the agreement, the above authorities would support enforcing the agreement. Therefore, we proceed to consider the following three questions: First, was the *nolle prosequi* entered because of an agreement between the parties? Second, if so, what were the terms of the agreement and the intentions of the parties? And third, what was the legal effect of the agreement?

¶ 34                          I. The *Nolle Prosequi* Was Entered as
                             Part of an Agreement With Defendant

¶ 35    The State briefly contends that there is no evidence that the CCSAO moved for a *nolle prosequi* as part of *any* agreement. The State notes that, when the assistant state's attorney read the statement about the *nolle prosequi*, she referred to defendant's volunteer service in the community. The State also argues that defendant's forfeiture of his bail bond was voluntary.

¶ 36    That the *nolle prosequi* was entered as part of an agreement with defendant is clear from the record. Again, when the *nolle prosequi* was entered, the assistant state's attorney stated:

> "After reviewing the facts and circumstances of the case, including Mr. Smollett's volunteer service in the community and *agreement to forfeit his bond* to the City of Chicago, the State's motion in regards to the indictment is to [nol-pros]. We believe this outcome is a just disposition and appropriate resolution to this case." (Emphasis added.)

The State contends that defendant admitted that the forfeiture of his bond was voluntary. However, the portion of the record that the State cites in support of this proposition is a sentence from defendant's motion to dismiss the indictment on double jeopardy grounds, which begins: "[u]nder the circumstances where the bond was *voluntarily forfeited as a condition of the dismissal of charges*." (Emphasis added.) This is fully consistent with defendant's position that the charges were dismissed as part of an agreement. Moreover, as defendant points out, the only other interpretation of the prosecutor's words is that defendant charitably agreed to give up his $10,000 bail bond at the exact moment that the prosecutor coincidentally dismissed the case. This is obviously not what happened.

¶ 37    Although we think it is clear from the assistant state's attorney's statement alone that the *nolle prosequi* was entered as part of an agreement with defendant, we note that the record contains even more support for this conclusion. In Judge Toomin's order appointing a special prosecutor, he specifically addressed the negotiations the parties entered into over the resolution, and he wrote that "there was no admission of guilt or plea when the agreement was consummated." Moreover, the OSP's own investigation revealed an agreement between the parties. The OSP's summary report of the conclusions and findings of its investigation, which the trial court made public at the OSP's request, is in the record. In the report, the OSP states that it interviewed defendant's "lawyer who negotiated the

resolution." Moreover, the OSP found that there was a conflict over "who negotiated the terms of the resolution with Mr. Smollett's lawyers." Two different assistant state's attorneys each stated that the other one negotiated the terms of the resolution with defense counsel, and defense counsel offered her version of which assistant state's attorney she negotiated the resolution with. The report also notes a discrepancy between the two assistant state's attorneys over when the CCSAO began discussing resolution terms with defense counsel. The report also states that the first assistant state's attorney offered terms to defendant, which he ultimately accepted. Additionally, the report quotes a press release that the CCSAO issued when it dismissed the charges. In this press release, the CCSAO states that it dropped the charges in return for defendant's agreement to do community service and forfeit his bond to the City of Chicago. The press release further states that, "Without the completion of these terms, the charges would not have been dropped." Finally, the report notes that the statement that the assistant state's attorney read in court on March 26, 2019, was drafted in conjunction with defendant's attorney. As the OSP's own report shows, there simply is no credible argument that the dismissal was not entered as part of an agreement with defendant.

¶ 38                                   II. Terms of the Agreement

¶ 39          The basic terms of the agreement are clear from the statement the assistant state's attorney read on March 26, 2019: community service and bond forfeiture on defendant's part and dismissal of the charges on the State's part. The complete terms of the agreement are set out in more detail in the OSP's summary report of its findings and are virtually identical to those set forth in the OSP's information release. According to the OSP's report, the CCSAO "made the decision to resolve the charges" as follows:

> "(1) complete dismissal of the 16-count felony indictment against Mr. Smollett; (2) no requirement that Mr. Smollett plead guilty to any criminal offense under Illinois law; (3) no requirement that Mr. Smollett admit any guilt of his wrongdoing (in fact, following the court proceedings on March 26, 2019, Mr. Smollett publicly stated he was completely innocent); (4) the only punishment for Mr. Smollett was to perform 15 hours of community service that had no relationship to the charged conduct; (5) only requiring Mr. Smollett to forfeit

- 16 -

his $10,000 bond as restitution to the City of Chicago (a figure amounting to less than 10% of the $130,106.15 in police overtime pay that the City alleges it paid solely due to Mr. Smollett's false statements to police); and (6) no requirement that Mr. Smollett participate in the CCSAO's Deferred Prosecution Program (Branch 9), which would have required a one-year period of court oversight over Mr. Smollett."

The OSP's report specifically refers to the above as the "terms of the dismissal."

¶ 40 It is equally clear that the parties intended finality. The State disagrees with this conclusion, relying on the boilerplate principle that a *nolle prosequi* is not a final disposition of a case and does not bar another prosecution for the same offense. See *People v. Milka*, 211 Ill. 2d 150, 172 (2004). Thus, according to the State, the dismissal of the charges via *nolle prosequi* shows that the parties did not intend finality. The State argues that the defendant's attorney remaining silent when the prosecution announced a dismissal by *nolle prosequi* shows that the parties did not intend a dismissal with prejudice. In response to a question at oral argument, the State conceded that its argument is that the parties did not enter into a nonprosecution agreement but rather a "not prosecute you today agreement." In other words, the CCSAO refiling charges the day after the defendant forfeited his $10,000 bond to the City of Chicago would have been perfectly in keeping with what the parties intended when they entered into the agreement. We disagree.

¶ 41 We agree with Justice Lyle that the assistant state's attorney's statement on March 26, 2019, clearly showed that the parties intended finality. Again, the assistant state's attorney stated that this outcome was a "just disposition and appropriate resolution to this case." This is not the statement of someone who intends to refile the charges. As cogently explained by Justice Lyle:

"While the State could have exercised greater semantical precision on the record by stating that the case was terminated with no intention of refiling, from the record it is apparent that was its intent. Any argument that suggests that the State had no intention of dismissing this case, as a conclusion and disposition of the prosecution, fails. The intent of the prosecutor to exercise the authority of the State in crafting and tendering its agreed disposition to the trial court was evident. The prosecutor stated she believed 'this outcome [was] a just disposition and appropriate resolution to this case.' Merriam-Webster defines

the term 'disposition' as 'the act or the power of disposing or the state of being disposed: such as' 'final arrangement' or 'settlement.' See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/disposition (last visited Nov. 16, 2023) [https://perma.cc/KKW9-KPJ2]. Those words denote a finality that would not exist if the State merely sought to refile the charges. In reality, there is no indication in the record or in any brief that the Cook County State's Attorney's Office had any intention to reinstate the charges. However, the State could not have predicted the public outcry precipitating an unprecedented appointment of a special prosecutor who would violate its lawful agreement with impunity. Ordinarily, when the State disposes of a case, the case file stays within its exclusive control and possession." 2023 IL App (1st) 220322, ¶ 173.

¶ 42        The intent of finality is also evident in the terms of the agreement as set forth by the OSP. In its report, the OSP states that the only "punishment" defendant would receive would be 15 hours of community service and forfeiture of his bond as restitution to the City of Chicago. Using words such as "punishment" and "restitution" connotes a case that is at an end, not one that the State intends to continue to pursue. Every time the OSP had a chance to describe the terms of the agreement, it described it as "complete dismissal" in exchange for punishment and restitution. The OSP also noted that the parties agreed that defendant would not have to plead guilty and would not have to participate in the deferred prosecution program. Again, these statements connote a case that is resolved rather than one that is ongoing.

¶ 43        That the parties intended finality is also supported by page after page of the OSP's summary report. There is no indication anywhere in the report that the CCSAO intended to further prosecute defendant, and there is every indication that the CCSAO considered the case *resolved*. For instance, the OSP states that, after the case was dismissed by the CCSAO, there was media speculation about whether something improper had gone on behind the scenes to allow defendant to "achieve the particular resolution he received." When setting forth the terms of the parties' agreement, the OSP stated that the CCSAO "made the decision to resolve the charges" under those terms. The OSP discusses an interview with State's Attorney Foxx in which she said that she was surprised by and disagreed with how the case was resolved. She believed that the community service should have been related to

the offense and that defendant should have had to pay more than $10,000 in restitution. She further stated that, if defendant was not going to be required to plead guilty, he should have at least been required to "admit facts of wrongdoing." She also told the OSP that she believed the case was resolved this way because "they wanted this guy [Mr. Smollett] out of town" because of the "flurry of activity" at the courthouse and the throngs of people who were coming to court. The OSP also stated that it interviewed lawyers who currently or previously worked in the CCSAO's criminal division who were surprised and shocked by at least some facet of the dismissal terms. The OSP also explained the various ways that the resolution defendant received did not track the requirements of the deferred prosecution program. Additionally, the OSP set forth the following quote from a press statement issued by the CCSAO when it dismissed the charges:

> "In the last two years, the Cook County State's Attorney's Office has referred more than 5,700 cases for alternative prosecution. This is not a new or unusual practice. An alternative disposition does not mean that there were any problems or infirmities with the case or the evidence. We stand behind the Chicago Police Department's investigation and our decision to approve charges in this case. We did not exonerate Mr. Smollet[t]. The charges were dropped in return for Mr. Smollet[t]'s agreement to do community service and forfeit his $10,000 bond to the City of Chicago. Without the completion of these terms, the charges would not have been dropped. This outcome was met under the same criteria that would occur for and is available to any defendant with similar circumstances."

¶ 44     All of the above statements indicate a case that has been resolved, not one in which further prosecution is contemplated. Indeed, nothing that happened after the initial case was dismissed makes sense if continued prosecution was contemplated. If, for instance, the CCSAO had nol-prossed the case because of evidentiary problems that would require further investigation before a prosecution could proceed, there would have been no public outcry.[2] A retired judge would not have sought appointment of a special prosecutor. If further prosecution by CCSAO were contemplated, Judge Toomin would not have argued that the disposition "shocked

___

[2]The OSP concluded in its report that "there is no indication that the CCSAO or CPD identified any new evidence after Mr. Smollett was indicted and before the CCSAO dismissed the [i]nitial Smollett Case that changed the CCSAO's assessment of the case." (Emphasis omitted.)

officialdom as well as the community." The OSP would not have stated in a press release that it disagreed with how the CCSAO "resolved the Smollett case" and contended that the disposition was dissimilar to how the CCSAO had disposed of similar cases. All of these things happened because the previous case had been *resolved*.

¶ 45 Finally, it defies credulity to believe that defendant would agree to forfeit $10,000 with the understanding that CCSAO could simply reindict him the following day. As Justice Lyle noted in her dissent:

> "While a defendant might appreciate the gift of a *nolle* when not part of underlying negotiations, why would a defendant bargain for uncertainty? When negotiating a disposition, a defendant is bargaining for the certainty that a plea, a cooperation agreement, or deferred prosecution agreement provides rather than rolling the dice with a trial." 2023 IL App (1st) 220322, ¶ 169.

¶ 46                                   III. Legal Effect of the Agreement

¶ 47                                   A. The State Is Bound by the Agreement

¶ 48 Because the charges were dismissed in exchange for defendant's community service and forfeiture of his bail bond and because defendant fully performed his end of the agreement, the State is bound by the agreement. The State contends that the most relevant authority is *Boyt*. We disagree. *Boyt* involved a plea agreement that the State backed out of before defendant entered a plea in reliance on the agreement. As *Stapinski* explained, the due process considerations are different in the plea agreement setting. *Stapinski*, 2015 IL 118278, ¶ 46. Moreover, the *Boyt* court distinguished *Starks* on the basis that the defendant in *Boyt* had "surrendered nothing" in reliance on the agreement. *Boyt*, 109 Ill. 2d at 416. Here, defendant surrendered $10,000 to the City of Chicago.

¶ 49 Because this case involves an agreement to dismiss charges in exchange for defendant doing something and defendant did what the agreement required, *Starks* and *Stapinksi* provide the relevant precedent. Again, *Starks* involved an alleged agreement between the prosecution and the defendant whereby the State would dismiss the charges if the defendant took and passed a polygraph examination. This

- 20 -

court stated that, "[i]f there was an agreement as alleged, and if Starks fulfilled his part of it, then the State must fulfill its part." *Starks*, 106 Ill. 2d at 452. *Stapinski* involved a situation where the State agreed not to bring charges against the defendant if he assisted them in a drug investigation. This court held that the principle for enforcing agreements such as this is the due process clause of the fourteenth amendment and that, when a defendant acted to his detriment in reliance on an agreement with the State, the State is required to honor the agreement as a matter of fair conduct. *Stapinski*, 2015 IL 118278, ¶ 48. Here, we have a fully executed agreement between defendant and the State. Both parties performed their part of the agreement, and the trial court enforced it. To allow the State to renege on the deal and bring new charges would be fundamentally unfair and offend basic notions of due process.

¶ 50 The State contends that the above cases are distinguishable in that the defendants in those cases surrendered constitutional rights in exchange for the dismissal of charges. By doing so, the defendants were hampering their ability to defend themselves against future charges. Here, by contrast, the defendant's reliance was forfeiting a $10,000 bond rather than a constitutional right. The State contends that the bond forfeiture was voluntary and that the voluntary forfeiture of a bond is fundamentally unlike a waiver of constitutional rights. We disagree with the State for several reasons.

¶ 51 First, as we have already explained, the State's assertion that the bond forfeiture was voluntary was based on a sentence from defendant's motion to dismiss where defendant stated that the bond was voluntarily forfeited as a condition of dismissal of the charges. In other words, the bond was forfeited in reliance on an agreement with the State. Indeed, in the OSP's own report, the bond forfeiture is described as a requirement. Second, this court's explanation in *Starks* for why the State was required to honor the agreement was not based on the defendant surrendering a constitutional right. The rationale was as follows:

> "The prosecution must honor the terms of agreements it makes with defendants. To dispute the validity of this precept would surely result in the total nullification of the bargaining system between the prosecution and the defense. Therefore, this court believes that if the prosecution did make an agreement

with the defendant, it must abide by its agreement in this case." *Starks*, 106 Ill. 2d at 449.

In the passage the State relies on, where this court discussed the defendant surrendering his fifth amendment privilege against self-incrimination, this court was addressing the State's argument that the agreement was merely a gift-type bargain lacking in consideration. *Id.* at 451. This court rejected that argument on the basis that the defendant's waiver of the privilege against self-incrimination was the consideration. *Id.* This court was simply addressing what the consideration was in the case before it. Nothing in *Starks* even remotely suggests that the forfeiture of a $10,000 bond could not be adequate consideration to enforce an agreement with the State.

¶ 52    Similarly, in *Stapinski*, when explaining why the State was required to honor its cooperation agreement, this court relied entirely on contract principles, due process, and fundamental fairness. See *Stapinski*, 2015 IL 118278, ¶¶ 47-52. The court was quite clear that

" '[w]here the government has entered into an agreement with a prospective defendant and the defendant has acted to his detriment or prejudice in reliance upon the agreement, as a matter of fair conduct, the government ought to be required to honor such an agreement.' " *Id.* ¶ 48 (quoting *State v. Wacker*, 688 N.W.2d 357, 362 (Neb. 2004)).

Nowhere in the discussion of why the defendant's due process rights were violated by the State's breach of the agreement did the court say anything to suggest that the only enforceable agreements with the State are those in which the defendant waives a constitutional right as consideration.

¶ 53    Later, in addressing a different argument, the *Stapinski* court referred to a defendant's reliance having constitutional consequences. There, the court was responding to the State's argument that the agreement was unenforceable because the police did not have the authority to bind the state's attorney to the agreement. This court rejected that argument, explaining that an "unauthorized promise may be enforced on due process grounds if a defendant's reliance on the promise has constitutional consequences." *Id.* ¶ 55. This court explained that the defendant had relied on the nonprosecution agreement he made with police and incriminated

himself in the process. Thus, he had suffered a prejudicial violation of his due process rights. *Id.* In that passage, the court was specifically addressing the circumstances under which an unauthorized promise is enforceable. Regardless, the State reneging on an agreement after the defendant had forfeited a $10,000 bond obviously has constitutional consequences. *Stapinski* explained that due process is a "fundamental premise of our system of justice, designed to protect an individual's personal *and property rights* from arbitrary and capricious governmental action." (Emphasis added.) *Id.* ¶ 50. This court further stated that due process is implicated whenever " 'the State engages in conduct towards its citizens deemed oppressive, arbitrary or unreasonable.' " *Id.* ¶ 51 (quoting *McCauley*, 163 Ill. 2d at 425). Moreover, because "the essence of due process is 'fundamental fairness,' due process essentially requires 'fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections.' " *Id.* (quoting *McCauley*, 163 Ill. 2d at 441). Clearly, the State reneging on a fully executed agreement after defendant had forfeited a $10,000 bond in reliance on the agreement would be arbitrary, unreasonable, fundamentally unfair, and a violation of the defendant's due process rights. See, *e.g.*, *Commonwealth v. Cosby*, 252 A.3d 1092, 1135 (Pa. 2021) ("at a minimum, when a defendant relies to his or detriment upon the acts of a prosecutor, his or her due process rights are implicated"); *Commonwealth v. Sluss*, 419 S.E.2d 263, 265 (Va. Ct. App. 1992) ("to allow the government to receive the benefit of its bargain without providing the reciprocal benefit contracted for by the defendant would do more than violate the private contractual rights of the parties—it would offend all notions of fairness in the related criminal proceedings, which are protected by constitutional due process").

¶ 54                    B. Under These Circumstances, Dismissal of the
                        Original Charges by *Nolle Prosequi* Did Not
                        Allow New Charges to Be Brought

¶ 55        The next question is whether, despite what the parties may have intended, the dismissal of the charges by way of a *nolle prosequi* allowed the State to bring new charges against defendant. The State argues that further prosecution was not barred because the first case was dismissed by way of a *nolle prosequi*. The State cites *People v. Daniels*, 187 Ill. 2d 301, 312 (1999), for the proposition that a *nolle*

*prosequi* "is not a final disposition of the case, and will not bar another prosecution for the same offense" (internal quotation marks omitted) and *People v. Hugues*, 2012 IL 112817, ¶ 23, for the proposition that a *nolle prosequi* "leaves the matter in the same condition as before the prosecution commenced." The State further argues, citing *People v. Gill*, 379 Ill. App. 3d 1000 (2008), and *People v. Ryan*, 259 Ill. App. 3d 611 (1994), that the court may not infer that a dismissal of charges was with prejudice. Rather, the record must affirmatively show that this was the prosecution's intent.

¶ 56    The rule that the State relies upon—that a defendant may be reprosecuted after a *nolle prosequi*—has never been absolute. Rather, as this court has clearly stated:

> "[W]e have previously held that if a *nolle prosequi* is entered before jeopardy attaches, the State may reprosecute the defendant subject to other relevant statutory or constitutional defenses (see, *e.g.*, *Ferguson v. City of Chicago*, 213 Ill. 2d 94, 102 (2004) (*nolle prosequi* 'does not toll the statute of limitations')) and ' "*absent a showing of harassment, bad faith, or fundamental unfairness.*" ' *Norris*, 214 Ill. 2d at 104 (quoting *People v. DeBlieck*, 181 Ill. App. 3d 600, 606, (1989))." (Emphasis added.) *Hughes*, 2012 IL 112817, ¶ 23.

As we have already explained above, Illinois case law establishes that it is fundamentally unfair to allow the prosecution to renege on a deal with a defendant when the defendant has relied on the agreement to his detriment.

¶ 57    Moreover, none of the cases the State cites involve a *nolle prosequi* that was entered as part of an agreement with a defendant. In *Kallberg*, the Supreme Court of Connecticut explained the difference between a unilateral *nolle* and one that is entered as part of a bilateral agreement with the defendant. *Kallberg* noted that, when a *nolle* is entered as a unilateral act by a prosecutor, the defendant may be tried again. *Kallberg*, 160 A.3d at 1041-42. However, the situation is different when the *nolle* is entered as part of an agreement with the defendant:

> "A nolle may, however, be bargained for as part of a plea agreement; see *State v. Daly*, 111 Conn.App. 397, 400 n.2, 960 A.2d 1040 (2008), cert. denied, 292 Conn. 909, 973 A.2d 108 (2009); Practice Book § 39-5 (2); see also *Mason v. State*, 302 Md. 434, 440, 488 A.2d 955 (1985) (nolle as part of plea agreement tantamount to dismissal of nolled charge); or as part of an agreement whereby

the defendant provides something else of benefit to the state or the victim in exchange for entry of a nolle. See, *e.g.*, *People v. Reagan*, 395 Mich. 306, 317-18, 235 N.W.2d 581 (1975) (enforcing agreement in which prosecution would enter nolle if defendant passed polygraph examination); see also *Holman v. Cascio*, 390 F.Supp.2d 120, 123-24 (D. Conn. 2005) ('a nolle will preclude a subsequent case for malicious prosecution [due to lack of a favorable termination of the prior criminal case] when it was made as part of a plea bargain or under other circumstances that indicate that the defendant received the nolle in exchange for providing something of benefit to the state or victim'). Bilateral agreements in which the defendant provides a benefit to the state or the victim other than a guilty plea to a charge are typically treated as the functional equivalent to a plea agreement, in that subsequent prosecution is barred as long as the defendant has performed his obligation. See *People v. Reagan*, supra, at 309, 235 N.W.2d 581 (nolle agreement was 'a pledge of public faith which became binding when the [n]olle prosequi order was approved by the trial judge'); see also *Bowers v. State*, 500 N.E.2d 203, 204 (Ind. 1986) (enforcing agreement not to prosecute in exchange for defendant's provision of information sufficient to obtain search warrant); *State v. Franklin*, 147 So.3d 231, 238 (La. App. 2014) (enforcing agreement not to prosecute conditioned on defendant's successful completion of pretrial diversion program), cert. denied, 159 So.3d 460 (La. 2015); *Jackson v. State*, 358 Md. 259, 262, 277-78, 747 A.2d 1199 (2000) (enforcing agreement in which defendant waived speedy trial rights in exchange for state's promise to dismiss charges if DNA analysis of certain evidence came back negative)." *Id.* at 1042.

The *Kallberg* court enforced an agreement whereby the prosecution agreed to nol-pros four felony counts in exchange for the defendant agreeing to make a donation of $271 to the Connecticut Criminal Injuries Compensation Fund. *Id.* at 1038, 1048.

¶ 58 At oral argument, defense counsel was asked whether this court had ever recognized a distinction between a unilateral and bilateral *nolle*. Defense counsel conceded that this court had not used those precise terms but argued that the distinction was implicit in this court's case law. We agree. While it is true that no Illinois court has used the term "bilateral *nolle*," this court has clearly recognized the principle that a *nolle* entered as part of an agreement bars further prosecution. This court's opinion in *Starks* was grounded in out-of-state cases that barred further

prosecution after a *nolle prosequi* because the State had breached the terms of an agreement. *Starks* relied on three out-of-state cases that had enforced agreements where the prosecution agreed to dismiss charges if the defendant passed a polygraph examination: *Reagan*, 235 N.W.2d 581; *Butler*, 228 So. 2d 421; and *Davis*, 188 So. 2d 24. *Reagan* was one of the very cases that *Kallberg* relied on in its discussion of a *nolle* entered as part of a bilateral agreement. See *Kallberg*, 160 A.3d at 1042. In *Reagan* and *Butler*, the initial charges against the defendants had been dismissed via a *nolle prosequi*, and in both cases, the courts held that further prosecution was barred because of an agreement between the prosecution and the defense.[3] See *Reagan*, 235 N.W.2d at 583, 587; *Butler*, 228 So. 2d at 423-25. The *Starks* court specifically acknowledged this in discussing these cases. See *Starks*, 106 Ill. 2d at 449-52.

¶ 59 Moreover, *Starks* itself was a case in which the parties had bargained for a *nolle prosequi*. As we discussed above, this court in *Starks* remanded the case to the trial court for an evidentiary hearing to determine if the parties had entered into an agreement to dismiss the charges if the defendant passed a polygraph. On remand, the trial court "found the State had failed to fulfill its promise to nol-pros the charge if defendant passed a polygraph examination." *People v. Starks*, 146 Ill. App. 3d 843, 844 (1986). In accordance with this court's mandate, the trial court dismissed the charge. *Id.* at 846. The appellate court affirmed. *Id.* at 848. The court rejected the State's argument that it was unfair to enforce such pretrial negotiations as binding contracts. *Id.* at 847-48. The court held that, because the defendant fulfilled his part of the agreement, the State was required to fulfill its part of the bargain. *Id.* at 848. Neither the trial court nor the appellate court put any significance on the fact that the prosecution had promised a *nolle prosequi* in exchange for the defendant passing the polygraph. Rather, they both acknowledged that the defendant fulfilling his end of the bargain meant that dismissal of the charge was required. *Id.* at 846, 848.

¶ 60 Case law thus establishes that, if a dismissal is entered as part of a nonprosecution agreement between the State and the defendant, the manner of the dismissal is not important. In fact, this court had recognized this principle long

---

[3]In *Davis*, the initial charges were quashed because of the agreement. See *Davis*, 188 So. 2d at 25-26.

before *Starks*. In *People v. Bogolowski*, 317 Ill. 460 (1925), this court allowed the defendant, who had testified against his codefendants, to withdraw his guilty plea after concluding that the State had breached a cooperation plea agreement. As part of its analysis, this court noted that a cooperation-immunity agreement could be perfected by entering a *nolle prosequi*:

> "The English practice of continuing the case against an indicted accomplice who has turned State's evidence and testified against his confederates to enable him to obtain a pardon, which he may plead in bar of the indictment, has never prevailed in Illinois. In this State the method has been, in accordance with the practice stated in Bishop's New Criminal Procedure, (vol. 2, secs. 1161, 1166,) either for the State's attorney to enter a *nolle prosequi* and call the defendant thus discharged as a witness, or to require him to plead guilty and examine him as a witness, after which, if his testimony shows a full and truthful disclosure of the facts, his plea may be set aside and a *nolle prosequi* or some other form of discharge may be entered." *Id.* at 467.

*Bogolowski* also quoted approvingly from *United States v. Lee*, 26 F. Cas. 910 (C.C.D. Ill. 1846) (No. 15,588):

> " 'The government is bound in honor, under the circumstances, to carry out the understanding or arrangement by which the witness testified, and admitted, in so doing, his own turpitude. Public policy and the great ends of justice require this of the court. If the district attorney shall fail to enter a *nolle prosequi* on the indictment against Lee the court will continue the cause until application can be made for a pardon. The court would suggest that to discontinue the prosecution is the shorter and better mode.' " *Bogolowski*, 317 Ill. at 464 (quoting *Lee*, 26 F. Cas. at 911).

¶ 61 And in *People v. Johnson*, 372 Ill. 18 (1939), this court held that further prosecution after the defendants had performed their part of a nonprosecution agreement was barred even when the original indictment was dismissed by a motion to strike *with leave to reinstate*. This court reasoned as follows:

> "The People, acting through their duly constituted authorities, reached an agreement with defendants at the time the motion was made to strike the indictment. In pursuance of this agreement, the People accepted $21,000 from

defendants in open court, in the following December (according to McArdle) were paid $13,000 in one sum on the back tax account and in subsequent months were paid about $10,000 more. In view of these substantial payments by defendants, the prosecuting officers are in honor bound to carry out the terms of their agreement. If the administrative and prosecuting agencies of the People fail to keep their legitimate agreements, public policy and the great ends of justice require the court to prevent such breaches of faith. *People v. Bogolowski*, 317 Ill. 460." *Id.* at 26.

¶ 62    We thus disagree with the State's position that the dismissal of the first case by *nolle prosequi* means that the State was allowed to bring a second prosecution against defendant. Because the initial charges were dismissed as part of an agreement with defendant and defendant performed his part of the agreement, the second prosecution was barred. The parties bargained for a dismissal, and the *nolle prosequi* was simply the means by which the State effectuated the agreement. To see the extreme unfairness arising from the State's position, consider a hypothetical in which the terms of the agreement were different. For instance, assume that the terms were along the lines of what State's Attorney Foxx told the OSP that she thought the terms should be. In exchange for a dismissal, defendant admitted facts of wrongdoing in open court, agreed to do 100 hours of community service working with victims of hate crimes, and voluntarily made $130,000 in restitution to the Chicago Police Department. After defendant performed the community service and sent $130,000 to the Chicago Police Department, the State dismissed the charges by way of *nolle prosequi*. If the State's position is correct, that means that the State could then file a new indictment against defendant and seek the maximum prison sentence. The State has not cited any authority that would support such a conclusion.

¶ 63    We echo Justice Lyle's point about the terrible policy consequences that would follow from adopting the State's position. Justice Lyle noted that the Cook County circuit court's administrative orders on the deferred prosecution program direct that charges should be dismissed by *nolle prosequi* upon successful completion of the program. See Cook County Cir. Ct. G.A.O. 2011-03 (Feb. 17, 2011) ("If the candidate successfully complies with all of the conditions of the agreement, the State's Attorney's Office shall motion the case up in Branch 9. The court shall be advised in the premises and the state shall nolle prosequi all charges against the

candidate."); Cook County Cir. Ct. G.A.O. 2011-06 (Feb. 28, 2011) (stating "[i]f the candidate successfully completes the program, his or her case will be nolle prosequi by the state's attorney"). As Justice Lyle noted:

> "If a *nolle* agreement has no effect, the State can reinstate charges for any number of defendants for whom it has entered *nolles*. The OSP reports indicated that the Cook County State's Attorney's Office, in the two years prior to Smollett's disposition, had referred over 5000 individuals into the DPP. I have noted that the guidance from the administrative order is for the State to nol-pros the case after completion of the program. This opinion has the effect of scaring every defendant who entered the DPP and completed it successfully, that the State can reinstate charges against them as long as it does not run afoul of the statute of limitations. This does not just affect the defendants, as in most circumstances, the State contacts victims before entering into a deferred prosecution agreement with the defendants. As a result, this ruling could reopen cases that victims had thought were previously resolved." 2023 IL App (1st) 220322, ¶ 174.

Such a result would be completely untenable. As the court held in *State v. Platt*, 783 P.2d 1206, 1206-07 (Ariz. Ct. App. 1989), deferred prosecution agreements are contractual in nature, and allowing the government to rescind the agreement after the defendant had fully performed under the agreement would comport "neither with ordinary contract principles nor with the more expansive notions of fundamental fairness that control the relations between a state and its citizens." It has simply never been the case that disposition by way of *nolle prosequi* always means that the State can bring new charges, and we decline to adopt such a rule now.

¶ 64      C. The Judge in the Appointment Proceeding Describing the
Original Prosecution as Null and Void Does Not Preclude
Defendant From Relying on the Agreement

¶ 65      Finally, the State makes a brief three-sentence argument that defendant may not make an argument based on a nonprosecution agreement in the original case because Judge Toomin found those proceedings to be void and defendant did not appeal from that order. We disagree. A circuit court's mere use of the word "void"

to describe another circuit court's judgment would not make it so. This court recognizes only two circumstances in which a judgment will be considered void: (1) when it is entered by a court that lacked personal or subject-matter jurisdiction or (2) when it is based on a statute that is facially unconstitutional and void *ab initio*. *People v. Stoecker*, 2020 IL 124807, ¶ 28. The most recent cases cited by Judge Toomin thus rejected the proposition from earlier cases that a prosecution by an improper prosecutor is null and void. As explained by the court in *People v. Woodall*, 333 Ill. App. 3d 1146, 1159 (2002):

> "Any defect in an attorney's appointment process or in his or her authority to represent the State's interests on a given matter is not fatal to the circuit court's power to render a judgment. The right to be prosecuted by someone with proper prosecutorial authority is *a personal privilege that may be waived if not timely asserted in the circuit court*." (Emphasis added.)

In *People v. Jennings*, 343 Ill. App. 3d 717, 726-27 (2003), the court relied on *Woodall* to hold that defendant was not entitled to have his conviction overturned because of a prosecutor's defective commission to prosecute because he had never objected to the court's recognition of the person as a prosecutor. In every case cited by Judge Toomin, it was the *defendant* who was arguing that the prosecutor was not authorized to prosecute. Here, defendant has never argued that the CCSAO was not authorized to prosecute. The proper prosecutor rule exists to protect defendants, not to allow the State to take advantage of its own errors to get a do-over.

¶ 66 Regardless, even if we accept Judge Toomin's reasoning that the original proceedings were void because there was "no State's Attorney" when those proceedings took place, the effect on defendant is exactly the same. He performed his end of the agreement and forfeited $10,000. If the previous proceeding is null and void, defendant could rightly wonder what happened to his $10,000. We specifically held in *Stapinski* that it was "not important" whether the cooperation agreement that the defendant entered into with the State was valid, as an "unauthorized promise may be enforced on due process grounds if a defendant's reliance on the promise has constitutional consequences." *Stapinski*, 2015 IL 118278, ¶ 55. Here, defendant entered into the agreement with full-time, licensed attorneys of the CCSAO, who—even if they did not have actual authority— unquestionably had apparent authority. And defendant relied on that agreement to

his detriment. We have already held that his reliance had constitutional consequences. Defendant was thus not foreclosed by Judge Toomin's order from raising his argument about the nonprosecution agreement.

¶ 67                                         CONCLUSION

¶ 68        We are aware that this case has generated significant public interest and that many people were dissatisfied with the resolution of the original case and believed it to be unjust. Nevertheless, what would be more unjust than the resolution of any one criminal case would be a holding from this court that the State was not bound to honor agreements upon which people have detrimentally relied. As the Supreme Court of Pennsylvania recently stated when enforcing a prosecutorial promise not to prosecute:

> "It cannot be gainsaid that society holds a strong interest in the prosecution of crimes. It is also true that no such interest, however important, ever can eclipse society's interest in ensuring that the constitutional rights of the people are vindicated. Society's interest in prosecution does not displace the remedy due to constitutionally aggrieved persons." *Cosby*, 252 A.2d at 1147.

That court further noted the consequences of failing to enforce prosecutorial promises when a defendant has relied on them to his detriment:

> "A contrary result would be patently untenable. It would violate long-cherished principles of fundamental fairness. It would be antithetical to, and corrosive of, the integrity and functionality of the criminal justice system that we strive to maintain." *Id.*

¶ 69        We reverse the judgment of the appellate court, reverse the judgment of the circuit court, and remand the cause with directions for the circuit court to enter a judgment of dismissal.

¶ 70        Judgments reversed.

¶ 71        Cause remanded with directions.

¶ 72        CHIEF JUSTICE THEIS and JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.